272 P.3d 1197

STATE of Hawai'i, Petitioner/Plaintiff–
Appellee,

v.

Hatem A. EID, Respondent/Defendant–
Appellant.

No. SCWC–29587.

Supreme Court of Hawai'i.

Jan. 26, 2012.

Brian R. Vincent, Deputy Prosecuting Attorney, for petitioner/plaintiff-appellee.

Jon N. Ikenaga, Deputy Public Defender, for respondent/defendant-appellant.

RECKTENWALD, C.J., NAKAYAMA, DUFFY, and McKENNA, JJ.; with ACOBA, J., concurring separately.

Opinion of the Court by
RECKTENWALD, J.

Hatem A. Eid was charged with excessive speeding in violation of Hawai'i Revised Statutes (HRS) § 291C–105(a)(1) (2007).[1] The charge stemmed from an incident on September 19, 2007, when Officer Benjamin Perez allegedly paced Eid's car with his own vehicle and concluded Eid was traveling 65 miles-per-hour (mph) in a 25 mph zone. Prior to that incident, Officer Perez had "speed checks" conducted on his vehicle at Roy's Kalihi Automotive Center & Towing (Roy's Automotive), on April 5, 2007 and July 23, 2007. Those checks were intended to establish that the speedometer was accurate.

Prior to trial, Eid filed a motion in limine to exclude any speed check or speedometer reading evidence on the ground that the State would be unable to lay a sufficient foundation. The District Court of the First Circuit[2] held an extensive pretrial hearing, which included testimony from the two mechanics who owned the speed check equipment and performed the tests pursuant to a contract with HPD. After five days of testimony, the district court denied Eid's motion in limine. At trial, the district court admitted the speed check and speedometer reading evidence over the objection of defense counsel. The district court then found Eid guilty of excessive speeding.

On appeal, the Intermediate Court of Appeals concluded that the district court erred in admitting the speed check and speedometer reading evidence. *State v. Eid*, No. 29587, 2011 WL 2308055, at *1 (App. June 9, 2011) (SDO). The ICA determined that the State did not meet the foundational requirements set forth by *State v. Fitzwater*, 122 Hawai'i 354, 376–77, 227 P.3d 520, 542–43 (2010), because the State only established the manufacturer of the "master head" component of the speed check equipment and not the entire speed check testing assembly. SDO at *1. The ICA remanded the case for further proceedings "for consideration of whether the remaining evidence was sufficient to convict Eid of the lesser included offense of Noncompliance with Speed Limit." *Id.* The State of Hawai'i timely sought review in this court.

The State raises one question in its application for a writ of certiorari: "Whether the ICA gravely erred by concluding that there was insufficient foundation, as a matter of law, to admit the speed reading obtained from the speedometer in Officer Perez's Ford Crown Victoria patrol car?"

---

1. HRS § 291C–105 provides, in pertinent part:

   **Excessive speeding.** (a) No person shall drive a motor vehicle at a speed exceeding:
   (1) The applicable state or county speed limit by thirty miles per hour or more; or
   (2) Eighty miles per hour or more irrespective of the applicable state or county speed limit.
   (b) For the purposes of this section, "the applicable state or county speed limit" means:
   (1) The maximum speed limit established by county ordinance;

   (2) The maximum speed limit established by official signs placed by the director of transportation on highways under the director's jurisdiction; or
   (3) The maximum speed limit established pursuant to section 291C–104 by the director of transportation or the counties for school zones and construction areas in their respective jurisdictions.
   (c) Any person who violates this section shall be guilty of a petty misdemeanor....

2. The Honorable David W. Lo presided.

For the reasons set forth below, we conclude that the State established a sufficient foundation to admit the speed check evidence, and consequently, the speedometer reading. Accordingly, we vacate the ICA's judgment and remand to the ICA.

## I. Background

The following factual background is taken from the record on appeal.

### A. Pretrial Motions

On January 25, 2008, Eid filed a Motion to Compel Discovery or in the Alternative, Motion to Dismiss for Violation of Hawai'i Rules of Penal Procedure (HRPP) Rule 16(b) and (c) [3] (motion to compel).[4] Eid pointed to a number of items that the State allegedly failed to produce in response to a discovery request made by Eid on November 27, 2007. Specifically, Eid listed the following items in his motion to compel:

(a) HPD departmental policies and procedures for conducting speeding citations;

(b) The HPD manual for speeding citations;

(c) The make and model of the car or motorcycle;

(d) The age of the car or motorcycle;

(e) The dates and description of repair work done on the car or motorcycle during the period of any applicable speedometer check;

(f) The age of each tire on the car or motorcycle and any information regarding maintenance of the tires;

(g) The speed check card, including:

i. The name of the auto shop used;

ii. The name of the person who conducted the speed check;

iii. A description of the procedures used to test the speedometer;

iv. Any other records regarding the speed check.

(h) The maintenance records for any vehicle alleged to have paced [Eid's] speed for the period of any speed checks (in particular, the records relating to the tires and drive train of the vehicle) for one year prior to and one year after the date(s) of the alleged offense;

(i) Any certification from any government or nongovernmental agency, including any speedometer/odometer check, done on any vehicle alleged to pace [Eid's] speed;

(j) Any speed reading for [Eid's] vehicle;

(k) The maintenance records, for one year prior and one year after the date(s) of any alleged offense(s), for any device used to calibrate the speedometer/odometer of any motor vehicle used to pace [Eid's] motor vehicle;

(l) The police maintenance records for any other speed measuring device used in this case, for the year prior and one year after the dates of any alleged offense(s), done on any vehicle alleged to have paced [Eid's] speed;

(m) The manufacturer's operators and maintenance manuals for any other speed measuring device used in this case, for the year prior and one year

---

**3.** Although Eid alleged a violation of HRPP Rule 16(b) and (c), Eid only asserted arguments under HRPP Rule 16(b) in his motion to compel. HRPP Rule 16(b)(2) provides, in pertinent part:

Upon written request of defense counsel and specific designation by defense counsel of material or information which would be discoverable if in the possession or control of the prosecutor and which is in the possession or control of other governmental personnel, the prosecutor shall use diligent good faith efforts to cause such material or information to be made available to defense counsel; and if the prosecutor's efforts are unsuccessful the court shall issue suitable subpoenas or orders to cause such material or information to be made available to defense counsel.

**4.** This is the first document in the record on appeal, although it appears that the district court held several prior hearings in which Eid was orally charged and requested continuances for the purpose of filing a motion to compel discovery.

In addition, it should be noted that the district court's denial of Eid's motion to compel is not at issue in the instant application, but is discussed at some length for background purposes because the arguments raised in that motion are related to the arguments raised in Eid's motion in limine regarding the admissibility of the speed check. As discussed *infra*, the district court held a single hearing on Eid's motion to compel and motion in limine.

after the dates of any alleged offense(s), done on any vehicle alleged to have paced [Eid's] speed;

(n) The speed check device manufacturer's established procedures for verifying and validating that the instrument was in proper working order;

(o) Written verification that said manufacturer's established procedures were followed;

(p) Written verification that the speed check device or machine was in proper working order;

(q) Records of regular maintenance, servicing, upkeep, repair, modification and/or calibration of the speed check machine or device performed by the manufacturer (or the manufacturer's duly trained and licensed representative, a year before and a year after the dates of any alleged offenses(s), as well as official maintenance, repair, modification, servicing, and/or calibration manuals for the device in question prepared by and/or relied upon by the manufacturer (or the manufacturer's duly trained and licensed representative[) ].

Eid argued that "[a]s the accuracy of the pacing method is contingent upon correct operating procedures employed by HPD, all information on which the speed check is based and that pertain to provide [sic] information relating to the speed of all vehicles involved in the incident are essential to [Eid's] case." Eid argued that the items listed in his motion to compel must be provided "in order to adequately prepare not only for trial, but also for anticipated pretrial motions." Eid further argued that the requested materials would "tend to negate [his] guilt[.]"

The State argued in its opposition that the discovery requested in Eid's motion to com-pel was beyond the scope of HRPP Rule 16(a) and (d). Specifically, the State argued that because this was not a felony case, and thus, discretionary discovery applied, Eid "fail[ed] to demonstrate that the requested items for training documents, records, and manuals [were] material and reasonable[,]" as required by HRPP Rule 16(d).

On February 29, 2008, Eid filed a Motion in Limine to Preclude Evidence of Honolulu Police Officer's Speed Check Card and Testimony of any Speedometer Reading (motion in limine). Specifically, Eid sought an in camera hearing regarding admissibility and sought to exclude: (1) any speed check card or testimony related to the contents of a speed check card performed on any vehicle alleged to have paced Eid's vehicle; and (2) the speedometer reading from any officer's vehicle that was alleged to have paced Eid's vehicle. In support of his motion, Eid argued: (1) a speed check does not fall within the business records exception or the public records exception to the hearsay rule; (2) admission of the speed check into evidence through testimony of an HPD officer would violate Eid's constitutional right of confrontation; (3) evidence adduced at the in camera hearing would fail to establish the requisite foundation for admission of the speed check cards and speedometer reading; and (4) the accuracy of a speed check and a speedometer go to the admissibility and not the weight of the evidence. The State did not file an opposition to Eid's motion in limine.

### B. Pretrial Hearing

A hearing on Eid's motion to compel commenced on April 16, 2008 and continued over the course of five days.[5] At the outset, the parties stipulated to certain exhibits being admitted into evidence for purposes of the hearing on the motion to compel.[6] The State presented the testimony of five witnesses:

---

5. Eid's case was heard with *State v. Montalbo,* 1DTC-07-045483, and the State referred to the two cases as "test cases" for using a police officer's speedometer in the prosecution of an excessive speeding charge.

6. These exhibits included: State's Exhibits 1-4 (photographs of the equipment used during speed checks); State's Exhibit 5 (Roy Ozaki's CV); State's Exhibit 6 (letters from North Holly-

wood Speedometer and Clock); State's Exhibit 7 (Duane Ozaki's CV); Defense Exhibit C (duplicates of the letters from North Hollywood Speedometer and Clock); Defense Exhibit D (a copy of Sergeant Sherman Dowkin's July 21, 2007 speed check card); Defense's Exhibit E (Marcus Ho's CV); and Defense Exhibit F (a copy of Officer Benjamin Perez's July 23, 2007 speed check card).

Roy Ozaki (Roy), Duane Ozaki (Duane), Michelle Oki, Sergeant Sherman Dowkin, and Officer Benjamin Perez. The defense's sole witness was Marcus Ho. The following relevant evidence was adduced at the hearing.

## 1. Roy Ozaki's Testimony

Roy, the owner of Roy's Automotive, and his son, Duane, testified as experts for the State.[7] Both Roy and Duane are licensed automotive mechanics and master certified automobile technicians. Roy testified that he and Duane are the only persons who conduct speed checks for customers at Roy's Automotive, and they performed speed checks on the speedometer of the vehicle used by Officer Perez in citing Eid.

Roy testified that they use three items to conduct speed checks: (1) a master head; (2) rollers; and (3) a cable [hereinafter collectively called "speedometer dynamometer"].[8] Roy testified that he obtained his speedometer dynamometer from another mechanic, Jack Higa. Higa gave Roy the speedometer dynamometer on the condition that he put in a bid to do speed checks for HPD. Roy did, and he was awarded a one-year contract with HPD from 2007–2008. After receiving the speedometer dynamometer, Roy did not immediately start checking HPD vehicles. Rather, Roy spent two to three weeks conducting at least four to six speed checks on his own vehicles prior to checking the first HPD vehicle. Roy explained that they "wanted to test [the speedometer dynamometer] and make sure [they] knew what [they] were doing and the results would be coming out the way [they were] supposed to be coming out." Roy estimated that in 2007, he performed more than 1,200 speed checks for HPD.

Roy testified that when he obtained the speedometer dynamometer from Higa, he did not feel that he and Duane, "being licensed technicians," needed "special training" to learn how to use the setup. Roy explained that "for a mechanic, it's pretty straightforward."[9] Roy recounted that Higa told him, "eh, you guys mechanics, you got two rolling wheels, the one cable, just get the car on there and you measure everything out. It's as simple as that, and you guys mechanics, you supposed to know what you're doing." Roy testified that he did not receive a manual from Higa for the speedometer dynamometer, but added that he did not feel that a manual was necessary.

Roy testified that during a speed check, the vehicle is placed on the rollers of the speedometer dynamometer and the car is started, causing the wheels of the car to spin and move the rollers. A cable connects the rollers to the master head. When the car's wheels turn the rollers, the cable that connects the rollers to the master head spins. The spinning cable causes the needle on the master head display to move and designate a speed, which is based on the speed at which the rollers are spinning. Roy's speedometer dynamometer is strictly mechanical and does not involve any computer software.

Roy further testified that during the speed check, the speed reading from the master head is compared with the speed shown on the car's speedometer at ten mile-an-hour increments, starting at 25 mph and ending at 95 mph. When asked whether he is "accurately recording the numbers on a speed check card[,]" Roy affirmatively responded that he "write[s] down what [he] see[s]." Roy explained that the speed check card reflects the readings of the car's speedometer and the master head at various speeds, including the extent to which the car's speedometer reading differs from the master head's reading.

Roy testified that in February or March of 2007, he noticed that comparison readings

---

7. The district court qualified Roy as an automotive vehicle mechanic expert and a motor vehicle mechanic dealer expert and qualified Duane as an expert in the fields of automotive mechanics and repair and automotive technology.

8. As explained *infra*, Roy's Automotive occasionally used a scanner, in addition to the speedometer dynamometer, to perform speed checks.

9. As discussed *infra*, the defense's expert witness, Ho, similarly testified that he did not believe formal training is necessary to learn how to use a speedometer dynamometer.

from the master head and the speedometer were "okay", up to 75 mph, but the car's speedometer was "showing typically two or three [mph] fast at eighty-five; four or five [mph] fast at ninety-five." Roy called Hartmut Behrens, of North Hollywood Speedometer, and notified Behrens of the master head readings. North Hollywood Speedometer was the manufacturer of the master head, and Roy believed that Behrens was the owner of North Hollywood Speedometer. Roy testified that he explained to Behrens how he was working his speedometer dynamometer and the types of cars being tested. Behrens told him, "you don't have to send it back, nothing's wrong, you've fallen close to that two percent [margin of error] and from what you're telling me, it's okay[.]"

Roy testified that he sent the master head to North Hollywood Speedometer in January 2008 to "get it checked out." Although Roy only sent the master head, he conveyed the necessary measurements of his rollers to North Hollywood Speedometer.[10] In response to Roy's inquiry, North Hollywood Speedometer sent two letters to Roy's Automotive signed by Behrens. In the January 16, 2008 letter, Behrens stated that the master head had been overhauled and calibrated to the "specifications of the speedometer roller device" used by Roy's Automotive. Behrens indicated in the second letter[11] that the master head was checked for accuracy *before* it was overhauled by North Hollywood Speedometer, with the following results:

| MPH Readout at: | Masterhead indicated |
| --- | --- |
| 30 | 31 |
| 60 | 62 |
| 80 | 82 |
| 90 | 93 |

The second letter further reported that "[b]esides the damage to the outside casing and lens we found the instrument to be in working condition." Below the results, the letter indicated that "[c]onsidering a [plus or minus two-percent] accuracy tolerance on the Masterhead[,] the readout is considered to be accurate." As noted *supra,* the parties stipulated to both letters being admitted into evidence for the purpose of the pretrial hearing.

The July 23, 2007 speed check card prepared by Roy's Automotive for Officer Perez's vehicle was also admitted into evidence by stipulation. A notation on the speed check card indicated that the speed check was performed through the use of the speedometer dynamometer and a "snap on scanner."[12] The July 23, 2007 speed check card showed that Officer Perez's speedometer was tested and found to have no discrepancies with the speedometer dynamometer at speeds up to 65 mph. At higher speeds, Officer Perez's speedometer was registering: 1 mile slow at 75 mph; 2 miles slow at 85 mph; 3 miles slow at 95 mph; 3 miles slow at 105 mph; and 3 miles slow at 110 mph. The initials on the speed check card indicated that Roy performed the speed check.

In addition, Roy testified about how a vehicle's tire size and tire pressure can affect a vehicle's speed, as well as their impact on the results of a speed check.

10. Roy testified that North Hollywood Speedometer has a "similar setup" as his shop based upon his correspondence with Behrens. Roy further testified that he did not know who manufactured the rollers or the cable on his setup, but he indicated that sometime in 2007 he replaced the original cable he received with one made by Higa.

11. Roy testified that even though the second letter was dated "January 29, 2009," the "2009" was a typographical error and should have read "2008."

12. In addition to using the master head to perform speed checks, Roy testified that for a brief period in July 2007, Roy's Automotive used devices called scanners to test HPD speedometers at speeds faster than 100 mph. According to

Roy, a scanner is a "diagnostic tool" that is attached to the vehicle's on-board computer that produces speedometer readings. The scanner reads data sent to a car's computer system, including the data used to produce the speed reading shown on the car's speedometer. When a scanner is used, three things are looked at, "[t]he speedometer head of the vehicle, the master head and the scanner."

For speed checks in which a scanner was used, Roy testified that they would place the car on the speedometer dynamometer and also connect the scanner. Roy or Duane would look at the readings from both the master head of the speedometer dynamometer and the scanner in testing the car's speedometer up to 100 mph. When the speed reached 100 mph, the master head of the speedometer dynamometer would be disconnected and only the scanner used.

### 2. Duane Ozaki's Testimony

Duane's testimony was substantially similar to Roy's. Duane testified that the purpose of the speedometer dynamometer is "to check speedometer accuracy." Duane testified that during a speed check, if there are discrepancies between the readings of the master head and the vehicle's speedometer, he will slow down the vehicle and then accelerate it again to confirm the readings. To Duane's knowledge, the rollers and cable were never checked by the manufacturers while in their possession.

On cross-examination, Duane conceded that all the components of the speedometer dynamometer needed to be working properly in order to get accurate readings. Duane also responded to extensive questions about how tire size and tire pressure could affect speedometer readings.

### 3. Marcus Ho's Testimony

The district court qualified Eid's expert witness, Ho, as an expert on the mechanics of a dynamometer. Ho testified that he did not have any formal training in auto mechanics, but he did not believe that formal training was necessary to operate a speedometer dynamometer. Rather, Ho believed that a person could "gain knowledge about the [speedometer] dynamometer by using it" "a couple [of] times." Ho testified that he owned and operated a chassis speedometer dynamometer, which operated under the same mechanical principles as Roy's Automotive's speedometer dynamometer, but differed in that it was not purely mechanical. Instead, Ho's produced a "digital readout[.]" The manufacturer of Ho's speedometer dynamometer was Dyno Jet. According to Ho, a speedometer dynamometer can measure horsepower, torque, and/or speed, depending on how it is set up. Ho testified at length about a number of factors that could affect the accuracy of the test, including the stretching or twisting of the cable, tire size, and tire pressure. Ho opined that there were "more variables than real-world conditions than on [Roy Automotive's speedometer dynamometer]." When defense counsel asked whether all three components of the speedometer dynamometer would need to be calibrated properly to give an accurate reading, Ho responded affirmatively.

### 4. Officer Benjamin Perez's Testimony

Officer Perez did not testify at the pretrial hearing. Rather, the defense and State stipulated to various facts relating to Officer Perez's purchase and maintenance of his subsidized vehicle. The parties did not stipulate to any facts related to the speed check, apparently because one of Officer Perez's speed check cards was already in evidence for the purpose of the hearing.

### 5. Michelle Oki's Testimony

Oki, a supervisor for the HPD Vehicle Maintenance Section, testified that Roy was the vendor that HPD used for speed checks, and no one at HPD calibrated speedometers. Oki testified that she has been working for HPD for almost 20 years in various positions, including a vehicle dispatch service writer, an automotive mechanic, and an automotive repair supervisor, her current position. Oki testified that based on her experience it was "very rare [to] have speedometer problems" in the patrol cars. HPD had procedures in place when a problem with a speedometer occurred. Oki further testified that in the last six years, a broken speedometer occurred "[a]bout nine times."

Additionally, Oki testified about the potential impact on her ability to perform her job if the court compelled her to provide some of the items requested by Eid's counsel in every traffic case.

### 6. Sergeant Sherman Dowkin's Testimony

Sergeant Dowkin, Traffic Enforcement Supervisor for the windward side of Oahu, testified that he drove a subsidized police vehicle, which he described as "a vehicle that the officers can select from a list of approved vehicles from a police department."

Sergeant Dowkin also provided testimony on the "pace-clock method" that officers use to measure the speed of another vehicle. He described it as following a vehicle for ideally "two-tenths of a mile[,]" while "attempting to maintain a steady distance between the tar-

get vehicle and [the officer's] vehicle," and then using the officer's speedometer to measure "the speed of the target vehicle[.]" Sergeant Dowkin was not aware of any manual "on how to do pace clocks[.]" He testified that he was aware of "HPD departmental policies and procedures for conducting speeding citations[,]" but that there were policies against disseminating that information to the public.

After hearing five days of testimony and considering summation memoranda submitted by both parties, the district court found that:

> [T]he defendants' expert, Marcus Ho, is an individual with experience in auto racing with construction and modification of cars for racing purposes. That Mr. Ho's Dynojet is utilized more for purposes of determining horsepower, drive training, engine performance issues, rather than for determining speed.

> The [c]ourt will further find that Mr. Ho's testimony was neither persuasive nor convincing in establishing that the requested discovery documents are reasonable and material, and as such, this [c]ourt will deny the defendants' motion to compel discovery.

> In terms of relevant information for pace cases, this [c]ourt will allow the following information, not by pretrial discovery, but rather upon testimony elicited by either direct or cross-examination of the citing officer. First being the applicable speed check card covering the date of citation, any repairs to the speedometer made since the date of the applicable speed check and any change in tire size made since the date of the applicable speed check.

> *In light of this [c]ourt's ruling, the [c]ourt finds that there is no need for a hearing on the defendants' motion in limine, and hereby deny [sic] same,* and

that these matters are to be set for trial forthwith.

(Emphasis added).

Eid filed a motion for clarification on September 23, 2008, requesting that "the court clarify whether, in denying the [m]otion in [l]imine, it relied upon the evidence adduced during the hearing on the [m]otion to [c]ompel [d]iscovery on April 16, April 30, May 14, June 4, and June 18, 2008[.]" At an October 3, 2008 hearing, the district court clarified that "the court's denial of the motion in limine [was] based on the same ruling and reasoning [the] court articulated for its denial of [Eid's] motion to compel."

### C. Bench Trial

On December 19, 2008, a one-day bench trial was held. At the outset, the parties stipulated that it was "proper for the court to consider the entirety of the hearings as to the motion to compel for its ruling on the motion in limine." Additionally, the parties stipulated that the three transcripts of the testimony of Roy and Duane would be entered into evidence. After going over a colloquy with Eid, and informing him of, inter alia, his right to confront and cross-examine Roy and Duane, the district court approved the stipulation and entered the three transcripts into evidence.

The State then proceeded to call its first witness, Mark Kikuchi, an employee of the City and County of Honolulu, Department of Transportation Services. Kikuchi testified that not all City and County streets and roads are listed within the speed schedules. Kikuchi further testified that Oneawa Street in Kailua is not listed on the speed schedule, but the speed limit for Oneawa Street is "25 [mph]" based on the default speed limit set by the Revised Ordinances of Honolulu (ROH).[13] Kikuchi also stated that there were signs posted on Oneawa Street that indicated the speed limit of 25 miles per

---

**13.** It appears that Kikuchi was referring to ROH § 15–7.2(b)(1) (1983), which provides:

No person shall drive a vehicle on a public highway or street at a speed in excess of the following speed limit zones established or hereafter established therefor by ordinance of the city council.

. . . .

(b) Twenty-five miles per hour.
(1) Any street or highway within the City and County of Honolulu where a speed limit has not been otherwise established.

hour. Over defense counsel's objections, the court eventually took judicial notice "that the default speed limit for Oneawa Street is 25 miles per hour" based on the default speed limit in ROH § 15–7.2(b)(1).

The State then called Officer Perez as its next and final witness. Officer Perez testified about the maintenance of his subsidized vehicle, a 2004 Ford Crown Victoria, which he was driving on September 19, 2007. Pursuant to HPD requirements, Officer Perez had a speed check conducted on his vehicle several times, because speed checks are good for "one year from the date of the speed check." Officer Perez testified that "speed checks are conducted to ensure the accuracy of the individual vehicle that is being checked," and that they are used "[t]o make sure that [his] speedometer is accurate when [he is] pace clocking other vehicles." He further testified that "speed checks [are] conducted on [his] vehicle in the course of regularly maintaining [his] subsidized HPD vehicle[.]"

Officer Perez testified that he had two speed checks that covered September 19, 2007, the day he issued the citation to Eid. Specifically, Officer Perez had a speed check conducted on his vehicle on April 5, 2007, the results of which were "written on a card with Roy's letterhead on it." Officer Perez explained that he personally took his car down to Roy's Automotive and waited for 20 to 25 minutes while Roy performed the speed check. When the State attempted to move the April 5, 2007 speed check card into evidence, defense counsel objected, arguing that "[it was] hearsay and it [did] not fall into the business records exception because the speed check card [was] being used purposely or solely in anticipation of litigation in issuing citations." Defense counsel further objected "pursuant to all the reasons included in [Eid's] motion in limine."

The State argued that it was "simply trying to lay [a] foundation under [Hawai'i Rules of Evidence] HRE Rule 104." Alternatively, the State argued that it had "laid a sufficient foundation for … the admission of the speed check card as a regularly conducted activity under HRE [R]ule 803(b)(6)." The court adopted the State's arguments and

overruled defense counsel's objections. Accordingly, a copy of the speed check card was admitted into evidence as State's Exhibit 1. The State proceeded to ask Officer Perez about his understanding of the April 5, 2007 speed check card. Officer Perez explained that Roy checked his speedometer at given speeds, and the results showed that when tested at 65 mph, his "vehicle['s] speedometer was also reading 65 [mph.]"

Officer Perez testified that he also had a speed check performed on July 23, 2007 at Roy's Automotive. The court also admitted a copy of the July 23, 2007 speed check card into evidence over the same defense objections. Officer Perez testified that the July 23, 2007 speed check card also showed that when tested at 65 mph, his speedometer was reading 65 mph. When asked whether this "show[ed] that [his] vehicle['s] speedometer [was] working properly[,]" Officer Perez answered affirmatively. Officer Perez explained that he had two speed check cards because the April 5, 2007 speed check was conducted using only the speedometer dynamometer, while the July 23, 2007 speed check was conducted using a scanner and the dynamometer.

Officer Perez further testified to the events leading to Eid's citation for excessive speeding. Officer Perez testified that on September 19, 2007, at 1:20 a.m., he was on duty and noticed Eid on Mokapu Boulevard turning onto Oneawa Street. Traveling behind Eid's car, Officer Perez observed that Eid started to accelerate in the area of Kaha Street "faster than what appeared to be 25[mph]." Officer Perez testified that he then pace-clocked Eid's vehicle for over two-tenths of a mile. Over defense counsel's objection,[14] Officer Perez testified that during the pace-clock, his speedometer read "65 [mph]." Officer Perez further testified that as he was pacing Eid, they passed at least three signs that indicated a speed limit of 25 miles per hour. Officer Perez then stopped Eid's vehicle and issued Eid a citation for traveling 65 mph in a 25 mph zone.

On cross-examination, defense counsel questioned Officer Perez about the two speed

14. The basis for the objection was "indiscernible."

check cards. Specifically, defense counsel pointed to the fact that "in April 2007 [Officer Perez's] speedometer was reading five miles fast at 95 miles an hour," while "three months later, in July of 2007 [Officer Perez's] speedometer was reading three miles slow at 95 miles an hour[.]" Officer Perez testified that he was not bothered by this discrepancy, because the differences were explained to him and "made sense[.]" Officer Perez further testified that he had no opinion as to whether one card was more accurate than the other. At the conclusion of Officer Perez's testimony, the State rested.

The defense then moved for judgment of acquittal, arguing that the "State [had] failed to make a prima facie case as to each and every material element of the offense charged, specifically, [ ] the establishment of the speed limit zone." The district court denied Eid's motion for judgment of acquittal.

Eid chose not to testify. The parties stipulated that Ho would not be called as a witness in the defense's case in chief, but the testimony of Ho from the hearing on the motion to compel would be received into evidence. After a colloquy with Eid, the district court accepted the stipulation, and the defense rested.

Both the State and the defense waived closing arguments. Thereafter, the court ruled in relevant part as follows:

> Based on the evidence presented at this trial today as well as taking into consideration the testimony by way of stipulation, the exhibits presented and the arguments made, the representation made by counsel throughout the trial, ... the State has presented convincing evidence beyond a reasonable doubt that the defendant was accurately paced by Officer Perez for three-tenths of a mile at 65[mph] and that his speedometer indicating on the—both speed checks were accurate despite the fact that there were discrepancy at higher rates of speed. The court is satisfied that the State has proven that the defendant was travelling [sic] in the—in the pace

clock distance at 65[mph] in a 25[mph] zone, and as such, will find [Eid] guilty.

The court entered judgment the same day, sentencing Eid to pay a $500 fine, a $30 criminal injuries fund fee, a $7 driver education assessment, a $75 driver education assessment, and a $25 neurotrauma fee. Additionally, the court ordered Eid to complete a driver's education improvement course and perform 36 hours of community service. Lastly, the court suspended Eid's license for 30 days. The court granted defense counsel's request to stay the sentence pending appeal.

### D. ICA Appeal

On January 13, 2009, Eid filed his Notice of Appeal.[15] In his Opening Brief, Eid argued that the district court abused its discretion: (1) in denying his motion to compel; and (2) in denying his motion in limine to preclude the evidence of Officer Perez's speed check card and speedometer reading. Regarding the denial of his motion to compel, Eid contended that "the items requested were material and the request was reasonable[,]" and thus, pursuant to HRPP Rule 16(b)(vii) and (d), the district court abused its discretion in denying the motion. As for the denial of his motion in limine, Eid contended that an insufficient foundation was laid to admit evidence related to the alleged speedometer reading. Specifically, Eid asserted that "the State failed to adduce the requisite foundation that the speedometer could be relied upon as substantive fact and that it was in proper working order."

In its Answering Brief, the State argued that much of the information requested was disclosed at the hearing on the motion to compel and any further discovery would amount to an "open-ended fishing expedition." Additionally, the State argued that Eid failed to show that discovery of certain requested items was material and reasonable as required by HRPP Rule 16(d). As for the motion in limine, the State contended that Officer Perez's speedometer was calibrated by Roy's Automotive using Roy's speedometer dynamometer. Evidence adduced at the

---

**15.** Note that the Notice of Appeal and ICA briefs submitted by the parties in this case predated

*Fitzwater,* which this court decided on March 3, 2010.

hearing indicated that "the speedometer in Officer Perez's Crown [Victoria] was accurate at 25, 35, 45, 55, and 65." Given the fact that Eid was cited for "going 40 mph over the applicable speed limit," the State argued that there was room for a 10 mph margin of error and that nothing in the record indicated that any potential error amounted to that.

### 1. The ICA's Lead Opinion

The ICA issued its SDO on June 9, 2011. The ICA's lead opinion held that "[t]here was insufficient evidence presented to satisfy the foundational requirements of [*Fitzwater*] for admissibility of the speed check card, and consequently, the speedometer reading in this case." SDO at *1 (internal citation omitted). The lead opinion noted that "the State failed to prove 'the manufacturer of the equipment used to perform the check[,]' insofar as only the manufacturer of the 'master head' and not the entire speed check testing assembly referred to as 'the dynamometer,' was established." *Id.* Accordingly, the lead opinion held that "it was error to deny Eid's motion in limine to exclude evidence of the speed check card and speedometer reading[,]" and concluded that "there was insufficient evidence supporting [Eid's] conviction for Excessive Speeding and that conviction must be reversed." *Id.* As a result, the ICA lead opinion found it unnecessary to address Eid's point of error concerning discovery, and remanded the case to the district court for consideration of whether the remaining evidence was sufficient to convict Eid of the lesser included offense of Noncompliance with Speed Limit. *Id.*

### 2. The ICA Dissent

In his dissent, Chief Judge Nakamura disagreed with the majority's reading of *Fitzwater*. Chief Judge Nakamura noted that on its face, *Fitzwater* required evidence that the speed check was "performed in the manner specified by the manufacturer of the equipment used to perform the check." SDO Dissent at *5. Chief Judge Nakamura contended that the foundational requirements established in *Fitzwater* "must be viewed in the context of the assumptions the court was required to make due to the lack of informa-

tion about the kind of test performed." *Id.* at *6. Thus, he did not "read *Fitzwater* as imposing an inflexible rule that, regardless of whether the court's assumptions about speed checks are true, the only way to establish the foundational requirements for admission of speed check results and speedometer readings is by reference to procedures and training established by the manufacturer." *Id.* Based on the testimony and evidence presented at the pretrial hearing, Chief Judge Nakamura concluded that the State was "able to lay an adequate foundation for the admission of Officer Perez's speedometer reading[,]" and "the admission of the July 23, 2007, speed check evidence." *Id.* at *7.

## II. Standards of Review

### A. Motion in Limine

■ The granting or denying of a motion in limine is reviewed for abuse of discretion. The denial of a motion in limine, in itself, is not reversible error. The harm, if any, occurs when the evidence is improperly admitted at trial. Thus, even if the trial court abused its discretion in denying a party's motion, the real test is not in the disposition of the motion but the admission of evidence at trial.

*Miyamoto v. Lum*, 104 Hawai'i 1, 7, 84 P.3d 509, 515 (2004) (internal quotation marks, citations, ellipses, and brackets omitted).

### B. Admissibility of Evidence

■ When a question arises regarding the necessary foundation for the introduction of evidence, the determination of whether proper foundation has been established lies within the discretion of the trial court, and its determination will not be overturned absent a showing of clear abuse.

*State v. Assaye*, 121 Hawai'i 204, 210, 216 P.3d 1227, 1233 (2009) *(internal quotation marks and brackets omitted).*

## III. Discussion

In his opening brief to the ICA, Eid argued, inter alia, that the district court erred in denying his motion in limine to preclude the admission of the speed check cards and Officer Perez's testimony as to his speedometer reading. Eid asserted that "the State

failed to adduce the requisite foundation that the speedometer could be relied upon as substantive fact and that it was in proper working order[,]" under principles set forth in *State v. Wallace*, 80 Hawai'i 382, 910 P.2d 695 (1996), and *State v. Manewa*, 115 Hawai'i 343, 167 P.3d 336 (2007). This court subsequently decided *Fitzwater*, which specifically addressed the foundation needed to admit speedometer readings and speed check card evidence. 122 Hawai'i at 365–77, 227 P.3d at 531–43. Based on its reading of *Fitzwater*, the ICA majority concluded that the State did not establish sufficient foundation, because it had not proved the identity of the manufacturer of the entire dynamometer. SDO at *1. For the reasons set forth below, the ICA erred in reaching that conclusion, since the evidence adduced at the pretrial hearing was sufficient to establish that "the speed check could be relied on as a substantive fact[.]" *Fitzwater*, 122 Hawai'i at 377, 227 P.3d at 543 (quoting *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725) (internal quotation marks omitted). Accordingly, the district court did not abuse its discretion in overruling Eid's lack of foundation objection and admitting the speed check evidence and Officer Perez's testimony.

## A. Foundational requirements required for admission of test results

*Fitzwater* is the leading case on point because it involved the reliability of speed check and speedometer reading evidence in an excessive speeding case. *Id. Fitzwater*, however, relied on prior cases regarding the admissibility of test results involving other types of testing instruments. *Id.* at 374–78, 227 P.3d at 540–44. Accordingly, a review of those cases follows.

In *Wallace*, this court examined the admissibility of test results relating to the weight of cocaine. 80 Hawai'i at 409–16, 910 P.2d at

722–29. At issue in *Wallace* was the reliability of the scale a chemist used to weigh the cocaine. *Id.* This court reiterated the fundamental evidentiary rule that "before the result of a test made out of court may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact." 80 Hawai'i at 407, 910 P.2d at 720 (quoting *State v. Kemper*, 80 Hawai'i 102, 105, 905 P.2d 77, 80 (App.1995)). This court stated that the reliability of a test result requires "a showing that the measuring instrument is 'in proper working order.'" *Id.* (quoting *State v. Thompson*, 72 Haw. 262, 263, 814 P.2d 393, 395 (1991)) (internal quotation marks omitted). Because the chemist "lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so[,]" this court concluded that the State failed to show that the balance was "in proper working order." [16] *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725. Accordingly, this court held that the chemist's testimony as to the net weight of cocaine was inadmissible because inadequate foundation was laid. *Id.*

Similarly, in *Manewa*, this court examined the admissibility of testimony relating to the results of an analytical balance used to weigh methamphetamine. 115 Hawai'i at 345–46, 167 P.3d at 338–39. At trial, an HPD criminalist testified to the weight of the methamphetamine, but he had not actually calibrated or serviced the balance himself, nor did he have knowledge about how it was done. *Id.* at 346, 167 P.3d at 339. The HPD criminalist merely testified that a manufacturer's representative "checks out and services the balance two times a year" and fills out a form indicating that the balance is in proper working condition.[17] *Id.* at 346, 355, 167 P.3d at 339, 348. This court identified the same

---

16. This court noted that defendant Wallace had conceded that the necessary information could have been, but was not, provided via a document from the calibrating agency "showing the name of the person calibrating the [balance], that he was qualified, [and] that [the balance] was calibrated on a certain date[.]" 80 Hawai'i at 412 n. 28, 910 P.2d at 725 n. 28.

17. This court noted that such documents were in existence, but were not offered by the state at trial. *See Manewa*, 115 Hawai'i at 355–56, 167 P.3d at 348–49 ("[A]s in *Wallace*, [the state] did not offer any business records of the manufacturer indicating a correct calibration of the balance.... Although available per the testimony of [the criminalist], [the state] did not offer such records into evidence.").

foundational concerns that it identified in *Wallace:* first, the manufacturer's service representative did not testify to calibration of the balance, and second, the State offered no business records of the manufacturer indicating a correct calibration of the balance. *Id.* at 357, 167 P.3d at 350. Accordingly, the court held that an "inadequate foundation was laid to show that the weight measured by the balance could 'be relied on as a substantive fact[.]'" *Id.* at 356, 167 P.3d at 349 (quoting *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725).

In *State v. Assaye,* this court applied the reasoning of *Wallace* and *Manewa* to a laser gun used to measure a defendant's speed in an excessive speeding case. 121 Hawai'i 204, 216 P.3d 1227 (2009). At trial, the officer testified that he was certified to use the laser gun and had also been instructed on how to test and operate it. *Id.* at 205–06, 216 P.3d at 1228–29. When asked about the results of the tests he had conducted on the laser gun prior to his shift, defense counsel objected as to lack of foundation. *Id.* at 206, 216 P.3d at 1229. The trial court overruled the objection and admitted the officer's testimony. *Id.* at 207, 216 P.3d at 1230. This court held that the officer's testimony did not provide a sufficient foundation for the laser gun's speed reading to be admitted as "substantive fact." *Id.* at 212–14, 216 P.3d at 1235–37. Specifically, this court held that "the prosecution must prove that the laser gun's accuracy was tested according to procedures recommended by the manufacturer." 121 Hawai'i at 215, 216 P.3d at 1238. The court further held that "the same burden of proof is applied to the issue of whether the officer is qualified by training and experience to operate the particular laser gun[,]" and found that the prosecution did not satisfy this burden either. *Id.* at 215–16, 216 P.3d at 1238–39.

Similar to the present case, *Fitzwater* involved charges of excessive speeding. 122

Hawai'i at 357, 227 P.3d at 523. In *Fitzwater,* the State offered testimony from Officer Neal Ah Yat, who stopped and cited Fitzwater for excessive speeding. *Id.* at 357–58, 227 P.3d at 523–24. Officer Ah Yat testified that a speed check was conducted on his police vehicle by "Jack's Speedo" in August 2006, but Officer Ah Yat did not testify about how the speed checks were done. *Id.* at 358, 227 P.3d at 524. Over defense counsel's objections, Officer Ah Yat testified to the results of the speed check, which indicated that "[t]he highest speed tested [was] at 75 miles per hour [and it] show[ed] that the vehicle was indeed going 75 miles per hour.'" *Id.* at 358–59, 227 P.3d at 524–25. Thereafter, the court admitted a copy of the speed check card into evidence over the objection of defense counsel. *Id.* at 359, 227 P.3d at 525. On cross-examination, Officer Ah Yat acknowledged that he had not personally taken his vehicle to Jack's Speedo and did not know how the speed check was conducted. *Id.* Based in large part on the testimony of Officer Ah Yat, the court found Fitzwater guilty of excessive speeding. *Id.* at 360, 227 P.3d at 526.

Fitzwater challenged his conviction on several grounds, including insufficient foundation for the admission of the speed check card and insufficient foundation to establish the speedometer had been properly calibrated. *Id.* at 361–62, 227 P.3d at 527–28. As a preliminary matter, this court addressed whether a speed check card could be admitted as a business record under HRE Rule 803(b)(6).[18] *Id.* at 362–63, 227 P.3d at 528–29. After noting that Officer Ah Yat's speed check card was most likely prepared by a private shop and then incorporated by HPD into its records, this court held that the card was not admissible since the state had offered insufficient evidence to establish the reliability of the document.[19] *Id.* at 369, 227 P.3d at 535.

**18.** HRE Rule 803(b)(6) (1993 and Supp.2002) provided in pertinent part:

> Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions,

or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

**19.** In contrast to the circumstances in *Fitzwater* where there was no evidence to establish the

This court also addressed Fitzwater's argument that "the State failed to establish a sufficient foundation to show that the speedometer had been properly calibrated under principles set forth in [*Wallace* ] and [*Manewa* ]." *Id.* at 374, 227 P.3d at 540. As a preliminary matter, this court examined *Wallace* and *Manewa*, which, as discussed *supra*, established the foundational requirements necessary before results of the calibration scales used to weigh narcotics can "be relied on as a substantive fact[,]" and observed that those underlying principles had been extended to the results of laser guns in *Assaye*. *Fitzwater*, 122 Hawai'i at 376, 227 P.3d at 542. This court then stated: *"Based on the record before us*, we see no reason to apply different foundational requirements in the context of speed checks, since the underlying concerns about the reliability of the testing appear to be similar." *Id.* (Emphasis added).

After determining that the foundational requirements of *Wallace* and *Manewa* should be extended to speed checks, given similar underlying concerns about the reliability of the testing, this court stated:

> [I]n order for the results of speed checks to be admissible, the State must establish: (1) how and when the speed check was performed, including whether it was performed in the manner specified by the manufacturer of the equipment used to perform the check, and (2) the identity and qualifications of the person performing the check, including whether that person had whatever training the manufacturer recommends in order to competently perform it.

*Id.* at 376–77, 227 P.3d at 542–43 (citing *Assaye*, 121 Hawai'i at 212–14, 216 P.3d at 1235–37; *Wallace*, 80 Hawai'i at 412 n. 28, 910 P.2d at 725 n. 28; *Manewa*, 115 Hawai'i at 355–57, 167 P.3d at 348–50).

As this court noted, "[t]he record [did] not indicate exactly what kind of test was performed at Jack's Speedo Shop," because the person(s) who actually conducted the speed check did not testify at trial. *Fitzwater*, 122

Hawai'i at 375, 227 P.3d at 541. Although the citing officer, Ah Yat, testified that a speed check was conducted on his police vehicle, his testimony did not establish how the test was conducted or the qualifications of the person who conducted it; rather, it was clear that his knowledge was based solely on the contents of the inadmissible speed check card itself. *Id.* at 358, 375, 227 P.3d 520 at 524, 541. Given these circumstances, we concluded that the "required information was missing from the record here[,]" and that "[a]s a result, inadequate foundation was laid to show that the speed check could be relied on as a substantive fact." *Fitzwater*, 122 Hawai'i at 377, 227 P.3d at 543 (citations and quotation marks omitted).

**B. The ICA erred in concluding that the State failed to establish a sufficient foundation for the reliability of the speed checks, and consequently, the speedometer reading**

■ Unlike *Fitzwater*, where there was no evidence to establish the reliability of the speed check, in the present case there is extensive evidence, including lengthy testimony from master certified automobile technicians Roy and Duane about the procedures and equipment used to conduct the checks, as well as Roy's discussions with North Hollywood Speedometer, the manufacturer of the master head, and correspondence from North Hollywood Speedometer documenting its calibration of the master head. As set forth below, this evidence established a sufficient foundation that the results from the speed checks conducted using the speedometer dynamometer could be relied on as substantive fact. *See Wallace*, 80 Hawai'i at 412, 910 P.2d at 725. More specifically, the State established that the speedometer dynamometer was in proper working order, and used by persons qualified to operate the device. *See Wallace*, 80 Hawai'i at 407, 412, 910 P.2d at 720, 725; *see also State v. Tailo*, 70 Haw. 580, 582, 779 P.2d 11, 13 (1989) ("The accuracy of a particular radar unit can be established by a showing that the operator tested

---

reliability of the speed check card, the parties here stipulated to Roy and Duane's pretrial testimony being admitted at trial. As discussed *supra*, that testimony involved detailed information

regarding how speed checks are performed at Roy's Automotive, as well as the existence of a contractual relationship between HPD and their shop.

the device in accordance with accepted procedures to determine that the unit was functioning properly and that the operator was qualified by training and experience to operate the unit.").

The State established that Officer Perez's speedometer was tested for accuracy through the use of the speedometer dynamometer on April 5, 2007 and on July 23, 2007. Officer Perez testified that he personally took his vehicle to Roy's Automotive for a speed check on April 5, 2007, and waited for 20–25 minutes before he received the results of his speed check from Roy the same day. Officer Perez also testified that he had a speed check conducted on July 23, 2007, and Roy's Automotive prepared the second speed check card as well. In contrast to the record in *Fitzwater*, Roy and Duane presented detailed testimony about how speed checks are conducted at their shop. *Cf. Fitzwater*, 122 Hawai'i at 375, 227 P.3d at 541 (noting that "[t]he record did not indicate exactly what kind of test was performed"). Specifically, Roy testified that they use a speedometer dynamometer, which is comprised of the master head, rollers, and a cable, to perform speed checks. Roy testified that the speedometer dynamometer is capable of calculating speed, and that it is strictly mechanical. Roy further testified that they compare the reading of the master head to that of the vehicle's speedometer at different speeds, and note any differences on the speed check card.

Other evidence supported the conclusion that the speedometer dynamometer was in "proper working order." *Wallace*, 80 Hawai'i at 407, 910 P.2d at 720. Roy testified that he called North Hollywood Speedometer, the manufacturer of the master head, in February or March of 2007 when he noticed slight discrepancies between the readings of the master head and a vehicle's speedometer at higher speeds. After listening to Roy explain how he was operating the machine, North Hollywood Speedometer indicated to Roy that "nothing's wrong[.]" Also, within six months of the July 23, 2007 speed check, Roy sent his master head in for calibration in January, 2008. At that time, Roy provided

the manufacturer with measurements of the size of the rollers, which were needed to perform the calibration. The manufacturer then sent Roy a letter, which was admitted into evidence, that showed that Roy's master head was accurate within 2 mph for speeds up to 80 mph.[20] Thus, the evidence in the instant case contrasts with previous cases in which the testifying witness assumed that the device had been properly calibrated, but did not have any personal knowledge. *See Fitzwater*, 122 Hawai'i at 358, 375, 227 P.3d at 524, 541 (noting that the testifying witness's testimony did not establish a sufficient foundation because it was clear that his knowledge was based solely on the contents of the inadmissible speed check card itself); *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725 (finding that the testifying witness "lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so"); *Manewa*, 115 Hawai'i at 355–56, 167 P.3d at 348–49 (noting that the state "did not call the manufacturer's service representative to testify to [the] calibration of the balance").

Additionally, the State established that the persons conducting the speed check were qualified by experience to operate the device. *See Tailo*, 70 Haw. at 582, 779 P.2d at 13. The State established at the pretrial hearing that only Roy and Duane, experienced auto mechanics, performed speed checks on HPD vehicles in 2007. The district court qualified Roy as an automotive vehicle expert and a motor vehicle mechanic dealer expert and qualified Duane as an expert in the fields of automotive mechanics and repair and automotive technology. Although Roy did not receive specific training on how to use the speedometer dynamometer, Roy testified that "for a mechanic, it's pretty straightforward." Notably, Eid's expert witness, Ho, similarly testified that he was not aware of any certification, school, or formal training for operating or using a speedometer dynamometer. Rather, Ho testified that a person would gain knowledge about a speedometer

**20.** The evidence established that the calibration was performed *prior* to the refurbishment of the master head, which was documented in a separate letter.

dynamometer by using it and through experience.

By showing that the speedometer dynamometer was in proper working order and used by qualified mechanics in conducting the speed checks, the State provided adequate assurances that the results of the speed checks were reliable. However, the ICA's lead opinion rejected that conclusion, because although the State established the manufacturer of the master head (North Hollywood Speedometer), it did not establish the manufacturer of the rollers and cable. SDO at *1. Thus, the ICA reasoned, there was insufficient evidence to establish the foundational requirements of *Fitzwater*. *Id.*

█ We do not read *Fitzwater* as imposing a requirement that the manufacturer of the entire dynamometer assembly be established, if there is sufficient evidence in the record to establish that the equipment that was used was reliable. Although Roy testified that he did not know who manufactured the rollers and cables,[21] he further testified that their operation is purely mechanical and was within his expertise as a licensed mechanic: the rollers are spun by the wheels of the car being tested, and that spin is transmitted to the master head by the cable. Moreover, the master head, which is a more sophisticated piece of equipment, was calibrated by its manufacturer North Hollywood Speedometer in January 2008, about six months after the second of the two speed checks performed on Officer Perez's car, and nine months after the first test; in connection with that calibration, Roy provided North Hollywood Speedometer with the size of the rollers, which was needed to determine the accuracy of the readings provided by the master head when used in Roy's dynamometer set-up. Also, in February or March of 2007, which was a month or two before the first of the two speed checks performed on Officer Perez's car, Roy spoke to North Hol-

lywood Speedometer, described the way he was working his dynamometer and the cars that he was testing, and confirmed that the results he was obtaining were "okay" because they were within the expected margin of error.

All of this evidence was sufficient to satisfy the requirement set forth in *Fitzwater* that the speed check be "performed in the manner specified by the manufacturer of the equipment[.]" 122 Hawai'i at 377–78, 227 P.3d at 542–43. While the manufacturer of the rollers and cable was not established, the absence of that information was not material, since their operation was straightforward and within the expertise of Roy and Duane as licensed mechanics.

Moreover, there was additional evidence that supports the admission of the evidence. During the second of the two speed checks, Roy used a digital scanner as well as the dynamometer, and the record supports the inference that its readings were consistent with those of the dynamometer.[22] Although the record does not contain detailed information about the recommended procedures for the use of the digital scanner,[23] nevertheless the readings provided by the scanner provide some additional corroboration for the accuracy of the dynamometer.

█ Lastly, we note that we are reviewing the district court's determination that adequate foundation was established for abuse of discretion. *Assaye*, 121 Hawai'i at 210, 216 P.3d at 1233 (noting that the trial court's determination "will not be overturned absent a showing of clear abuse") (citation omitted). Given the evidence adduced here to establish a foundation, we cannot say that the district court abused its discretion in admitting the speed check evidence. That evidence in turn provided a sufficient foundation for Officer Perez's testimony regarding his speedometer reading on the day he cited Eid for excessive speeding. Specifically, both speed check

21. At some point during 2007, Roy testified that he installed a replacement cable that had been made by Higa.

22. Roy testified that when a scanner is used, he compares the readings of the master head, scanner, and the vehicle's speedometer at speeds up to 100 mph. Roy testified that when they would

reach 100 mph, they would detach the master head, and continue the speed check with just the scanner.

23. Roy testified that he updates the software for his scanners at least once every two or three years.

cards showed that Officer Perez's speedometer was accurately reading 65 mph when it was tested at that speed. Additionally, Officer Perez testified that prior to September 19, 2007, the day he cited Eid for excessive speeding, he did not have any repairs done to his speedometer. Accordingly, a sufficient foundation was laid for Officer Perez to testify that he paced Eid at 65 mph in a 25 mph zone.

## IV. Conclusion

For the foregoing reasons, we conclude that the State established a sufficient foundation to admit the speed check evidence, and consequently, the speedometer reading in this case. Accordingly, we vacate the judgment of the ICA, and remand to the ICA for a determination of whether the district court abused its discretion in denying Eid's motion to compel.

Concurring Opinion by ACOBA, J.

At oral argument, in *State v. Fitzwater*, 122 Hawai'i 354, 227 P.3d 520 (2010), Petitioner/Plaintiff–Appellee State of Hawai'i (Petitioner) considered it " 'unfortunate' " that " 'there was not very detailed testimony as to what the speed check tests composed of and what the person who conducted the tests did.' " *Id.* at 382, 227 P.3d at 548 (Acoba, J., concurring and dissenting). According to Petitioner, there was a " 'test case' [ ] on appeal 'before the ICA' in which 'the person who conducted the tests actually came in to trial and gave live testimony to what he did.' " *Id.* The instant case is apparently the "test case" that Petitioner referred to in

*Fitzwater.*,[1] but that was not before this court at the time.

In *Fitzwater*, in my view, "there was an absolute failure of proof[,]" with respect to the foundational requirements for admitting the speed check cards and the police officer's testimony regarding his speedometer reading at the time he paced the defendant's vehicle. *Id.* at 378, 227 P.3d at 544. Consequently, there was no need for the majority to provide "guidance[,]" for admitting speed card evidence under the business record exception to the rule against hearsay, HRE Rule 803(b)(6), or to decide that such admission would not violate a defendant's right of confrontation under the United States Constitution, inasmuch as that "guidance" could not be applied to the facts in *Fitzwater*. *See id.* at 365–74, 227 P.3d at 531–40 (majority opinion). Unlike *Fitzwater*, this is a "case[ ] that [is] premised on facts for which our ruling will have a real consequence." *Id.* at 382, 227 P.3d at 548 (Acoba J., concurring and dissenting).

## I.

Pertinent to the issue raised by Petitioner in its application for writ of certiorari (Application), " '[a] fundamental evidentiary rule is that before the result of a test made out of court may be introduced into evidence, a *foundation must be laid showing that the test result can be relied on as a substantive fact.*' " *Id.* at 379, 227 P.3d at 545 (quoting *State v. Long*, 98 Hawai'i 348, 354, 48 P.3d 595, 601 (2002)) (emphasis in original; brackets omitted). In light of Hawai'i Rules of Evidence (HRE) Rules 702[2] and 703,[3] it is

(Emphases added.)

1. The audio recording of the oral argument is available at http://www.courts.state.hi.us/courts/oral_arguments/recordings_archive.html under case number 28584 at 0:41:44 to 41:53.

2. HRE Rule 702 provides:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, *a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.* In determining the issue of assistance to the trier of fact, *the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.*

3. HRE Rule 703 provides:
   *The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,* the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.
   (Emphasis added.)

apparent that " 'a proper foundation for the introduction of [the speed check card] would necessarily include expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the measuring instrument is 'in proper working order.' " *Id.* (quoting *State v. Manewa*, 115 Hawai'i 343, 350, 167 P.3d 336, 343 (2007) (quoting *Long*, 98 Hawai'i at 355, 48 P.3d at 601)) (internal quotation marks omitted).

In contrast to *Fitzwater*, in this case, Roy Ozaki (Roy), the owner of Roy's Automotive (Roy's), provided expert testimony regarding his " 'qualifications' " to operate the dynamometer. *Id.* In addition, Roy testified extensively regarding how the dynamometer was used to calibrate the speedometers in the HPD vehicles, establishing that " 'valid techniques [were employed] to obtain the [speed check] result[s].' " *Id.* Finally, a letter from the manufacturer of the master head used by Roy's to conduct the speed checks was stipulated into evidence for purposes of the hearing on the motion in limine, indicating that the master head was "found ... to be in working condition" and "considered to be accurate." In other words, evidence was adduced before the district court of the first circuit (the court) establishing that the dynamometer used to conduct the speed checks was " 'in proper working order.' " *Id.* (internal quotation marks omitted).

In light of the foregoing, proper foundation was laid through Roy's testimony for the admissibility of the speed check cards and testimony pertaining to the speedometer reading in this case. Accordingly, here, we have had "the benefit of a concrete controversy to validate our opinion[,]" *id.* at 381, 227 P.3d at 547, that was lacking in *Fitzwater*.

II.

The sole question raised by Petitioner in its Application is: "Whether the [Intermediate Court of Appeals (ICA)] gravely erred by concluding that there was insufficient foundation, as a matter of law, to admit the speed reading obtained from the speedometer in Officer Perez's ... patrol car?" On appeal to the ICA, similar to *Fitzwater*, Respondent/Defendant–Appellant Hatem A. Eid (Respondent) raised other issues pertaining to whether the speed check evidence fell within the business record exception to the rule against hearsay, HRE Rule 803(b)(6),[4] and whether the admission of the speed check card into evidence through the testimony of an HPD officer would violate Respondent's right of confrontation under the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. However, Respondent neither filed an application for writ of certiorari from the judgment of the ICA nor a Response to Petitioner's Application. Consequently, these issues raised on appeal to the ICA by Respondent are not implicated on the instant writ. Therefore, as to the sole question raised by Petitioner, a proper foundation was laid by expert testimony to support the court's admission of the speed check cards and Officer Perez's speedometer testimony into evidence. On that ground, I concur.

4. HRE Rule 803(b)(6) provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, *made in the course of a regularly conducted activity, at* or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, *unless the sources of information or other circumstances indicate lack of trustworthiness.*
(Emphases added.)