***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

**Electronically Filed
Supreme Court
SCAP-11-0000500
28-NOV-2012
08:55 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Petitioner/Plaintiff-Appellee,

vs.

JOSE R. GONZALEZ, III, Respondent/Defendant-Appellant.

SCAP-11-0000500

APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
(CASE NO. 1DTC-11-001356)

November 28, 2012

RECKTENWALD, C.J., NAKAYAMA, ACOBA, AND MCKENNA, JJ., AND CIRCUIT
JUDGE WILSON, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY ACOBA, J.

We hold that the offense of driving at an excessive

speed, Hawai'i Revised Statutes (HRS) § 291C-105(a),[1] is not a

strict liability offense and requires proof that the defendant

acted intentionally, knowingly, or recklessly. Thus, the

requisite states of mind must be alleged in a charge of this

---

[1]     HRS § 291C-105(a) provides in relevant parts as follows:

        (a) No person shall drive a motor vehicle at a speed
    exceeding:
        (1)    The applicable state or county speed limit <u>by
               thirty miles per hour or more</u>; or
        (2)    <u>Eighty miles per hour or more irrespective of
               the applicable state or county speed limit</u>.

(Emphases added.)

offense. Because the HRS §291C-105(a) charge against Defendant-Appellant Joseph R. Gonzalez, III (Defendant) failed to allege the requisite states of mind, we vacate the June 2, 2011 judgment of the district court of the first circuit (the court)[2] and instruct the court to dismiss the charge without prejudice. We conclude also that Plaintiff-Appellee State of Hawai'i (State), failed to lay an adequate foundation to admit the laser instrument reading of Defendant's vehicle's speed into evidence.

I.

A.

On June 2, 2011, Defendant was orally arraigned and charged in the court with excessive speeding, HRS §§ 291C-105(a)(1) and/or (a)(2). The charge alleged as follows:

> [Defendant], you're charged with on or about the 14th of January, 2011, in the City and County of Honolulu, State of [Hawai'i], you did drive a motor vehicle at a speed exceeding the applicable State of [Hawai'i] or county speed limit by 30 miles per hour or more and/or 80 miles per hour or more irrespective of the applicable State of Hawai'i or county speed limit. By doing so you violated Section 291C-105 (a)(1) and/or (a)(2) of the [HRS].
> You are subject to sentencing in accordance with Section 291C-105(c)(1)[3] of the [HRS] where you have

---

[2]     The Honorable Paula Devens presided.

[3]     HRS § 291C-105(c)(1) (2011) provides in relevant part as follows:

> (c) Any person who violates this section shall be guilty of a petty misdemeanor and shall be sentenced as follows without the possibility of probation or suspension of sentence:
>         (1)     For a first offense not preceded by a prior conviction for an offense under this section in the preceding five years:
>         (A)     A fine of not less than $500 and not more than $1,000;
>         (B)     Thirty-day prompt suspension of license and privilege to operate a vehicle during
>                                                 (continued...)

> no prior convictions under Section 291C-105 in the
> preceding five years.  And you are charged with going
> 96 in a 55 mile per hour zone.

After the charge was read, Defendant orally moved to dismiss the

charge, arguing that the oral charge "fail[ed] to state the

requisite state of mind" under HRS § 702-204.[4]  The State

responded by arguing that a defendant's state of mind is not an

element of an offense, and, as such, need not be alleged in an

oral charge.  The court denied Defendant's motion, ruling that

when a statute does not expressly set forth the culpable state of

---

[3](...continued)

> the suspension period, or the court may
> impose, in lieu of the thirty-day prompt
> suspension of license, a minimum
> fifteen-day prompt suspension of license
> with absolute prohibition from operating a
> vehicle and, for the remainder of the
> thirty-day period, a restriction on the
> license that allows the person to drive
> for limited work-related purposes;
> (C)  Attendance in a course of instruction in
> driver retraining;
> (D)  A surcharge of $25 to be deposited into
> the neurotrauma special fund;
> (E)  May be charged a surcharge of up to $100
> to be deposited into the trauma system
> special fund if the court so orders;
> (F)  An assessment for driver education
> pursuant to section 286G-3; and
> (G)  Either one of the following:
> (i)  Thirty-six hours of community
> service work; or
> (ii)  Not less than forty-eight hours and
> not more than five days of
> imprisonment.

(Emphases added.)

[4]     HRS § 702-204 provides in relevant part as follows:

> Except as provided in section 702-212, a person
> is not guilty of an offense unless the person acted
> intentionally, knowingly, recklessly, or negligently,
> as the law specifies, with respect to each element of
> the offense.  When the state of mind required to
> establish an element of an offense is not specified by
> the law, that element is established if, with respect
> thereto, a person acts intentionally, knowingly, or
> recklessly.

mind, but rather imports the mens rea element from HRS § 702-212 (2011), that "obviates the need of the [S]tate to articulate a state of mind."

B.

Officer Jeremy Franks (Franks) of the Honolulu Police Department testified on behalf of the State. He related that on January 14, 2011, he was on duty and positioned along the H-2 freeway, northbound, before the Mililani Mauka off-ramp. While on duty, he observed a vehicle approaching his location and "passing traffic." Officer Franks testified that he used his Laser Technology Incorporated (LTI) Ultralyte 100 Laser (laser gun) to measure the oncoming vehicle's speed. The laser gun provided a reading of ninety-six miles per hour, and because the vehicle was traveling in a fifty-five-mile-per-hour zone, he proceeded to stop the vehicle.

Officer Franks testified that he was trained in the use of the laser gun and that he had verified its accuracy on the date in question. Officer Franks' training consisted of "four hours of operator training in January of [2003] in the police academy," and "further training as an instructor by LTI representatives themselves as well as laser instructor currently retired Sergeant Bobby Lung." As to accuracy, Officer Franks explained that at his initial training in the use of the laser gun in 2003, he was provided with a manual "from [LTI]." That manual provides four separate tests "that an operator must do

4

prior to using the laser on the shift." Officer Franks related that he performed all four tests prior to using the laser gun on January 14, 2011.

On cross-examination, Officer Franks testified that although the manual containing the four tests was not the manual that was provided with the laser gun, it did contain both the HPD seal and the LTI copyright. He further recounted that he received additional training directly from LTI personnel, where the LTI personnel reviewed the HPD manual, and that all the information covered by the LTI personnel was replicated in the manual.

C.

Defendant testified that he was a military police officer in the United States Army. Defendant also stated that he had training in the use of both radar guns and laser guns. On January 14, 2011, Defendant was pulled over at approximately 9 p.m. According to Defendant, he was driving at a speed of fifty-five miles per hour "on average." As he was driving, Defendant observed a black Jeep Wrangler in the lane next to him, which drove erratically, often speeding up to pass him before slowing down to return to a position next to him. Defendant believed that the Wrangler was traveling seventy miles per hour.

Defendant also related that the struts in his vehicle were functioning poorly. Due to this mechanical defect, Defendant explained that whenever he tried to go faster than

sixty miles per hour, his car would shake and was difficult to control.  He stated that on January 14, 2011, his car did not shake or become difficult to control while he was driving.

### D.

At the end of trial, the court found Defendant guilty as charged.  The court ruled that it found Officer Franks' testimony credible, and based on Officer Franks' testimony it found Defendant guilty beyond a reasonable doubt "on each and every element that the State needs to prove."  The court noted that this included the state of mind element, and held that "the State did prove [that Defendant] acted recklessly."

### II.

On appeal, Defendant raises the following points of error:

> I. The trial court erred in denying [Defendant's] motion to dismiss because the prosecution's citation and oral charge for excessive speeding was fatally insufficient because it failed to allege the requisite mens rea.
>
> II. The trial court erred in finding that the State put forth a prima facie case and receiving evidence of the laser gun speed reading because the State failed to lay a sufficient foundation for the speed reading taken by the laser gun.

### III.

### A.

As to the first point of error, Defendant argues that state of mind is an "essential element" of the charged offense, and because the oral charge did not allege Defendant's state mind, the charge must be dismissed.  (Citing State v. Jendrusch,

58 Haw. 279, 281, 567 P.2d 1242, 1244 (1977).) Defendant also argues that "the State's failure to allege the state of mind amounts to a failure to state an offense, and a conviction based upon it cannot be sustained, for that would constitute a denial of due process." (Quoting State v. Elliot, 77 Hawaiʻi 309, 311, 884 P.2d 372, 374 (1994).) (Punctuation omitted.)

B.

1.

In its Answering Brief, the State argues that it was not required to allege a mens rea element, because HRS § 291C-105(a) is a strict liability offense and, therefore, the state of mind requirements in HRS § 702-204 do not apply. As an initial matter, the State argues that although it did not raise before the court the argument that HRS § 291C-105(a) (2011) is a strict liability offense, it is not precluded from raising this argument for the first time on appeal because the court ruled in its favor on this issue. According to the State, "[a]n appellate court may affirm a judgement of the lower court on any ground in the record that supports affirmance," and "[the State] is merely submitting a different reason explaining why the trial court's denial of [Defendant's] oral motion to dismiss is the correct result." (Citing State v. Fukagawa, 100 Hawaiʻi 498, 506, 60 P.3d 899, 907 (2002); State v. Dow, 96 Hawaiʻi 320, 326, 30 P.3d 926, 932 (2001); Poe v. Hawaiʻi Labor Relations Bd., 87 Hawaiʻi 191, 197, 953 P.2d 569, 575 (1998).)

2.

It is questionable whether the State may argue on appeal that HRS § 291C-105(a) is a strict liability offense. It is a "well-settled maxim" that "the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal." State v. Kikuta, 125 Hawai'i 78, 89, 253 P.3d 639, 650 (2011); see also State v. Ildefonso, 72 Hawai'i 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived."); State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal."). The cases cited by the State do not negate this proposition. None deal with circumstances where the prevailing party waived the argument raised on appeal. Our precedent clearly demonstrates that a party can waive an argument by failing to raise it at trial even if the party ultimately prevails on that issue. Kikuta, 125 Hawai'i at 89, 253 P.3d at 650.

Although the State prevailed in the trial court, Kikuta held that the State waived the argument that the parental use of force was not for disciplinary reasons because it did not raise that argument before the trial court. Id.; see also State v. Harada, 98 Hawai'i 18, 30, 41 P.3d 174, 186 (2002) (holding that the State waived the argument that exigent circumstances

8

justified a violation of the knock-and-announce rule by failing to raise it at trial even though the State prevailed on a different argument at trial); State v. Rodrigues, 67 Haw. 496, 498, 692 P.2d 1156. 1158 (1985) (precluding the State from raising arguments regarding exigent circumstances and the good faith exception on appeal when they were not raised in the trial court, even though the State prevailed on other grounds at trial); but see State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) (holding, under similar circumstances, that "[c]onsideration of the appellee's argument in this situation is appropriate, even though not raised before the circuit court, because the appellee never had the need to raise such an argument before the circuit court").

In the instant case, the State had the opportunity to raise before the court the argument that HRS § 291C-105(a) is a strict liability offense. At the beginning of trial, Defendant raised the State's failure to allege a state of mind when the State read the oral charge. Instead of responding that the charge was not deficient because the statute was a strict liability offense that contained no mens rea requirement, the State relied on its argument that mens rea was not an element of the offense, and therefore did not have to be included in the oral charge. At that point, the State chose to forego reliance on a strict liability argument, and, under Kikuta, Harada, and Rodrigues, that argument would be waived.

None of the cases cited by the State allow a party to raise an issue on appeal when that issue was not raised before the trial court. Fukagawa, for example, held that even if the trial court had incorrectly rejected the defendant's argument that he had possessed a de minimis amount of methamphetamine, based on the evidence, the defendant would still be convicted because he could not possibly meet his burden of demonstrating that this was a de minimis offense. 100 Hawaiʻi at 507, 60 P.3d at 908. To show that his offense was de minimis, the defendant was required to address both the nature of the conduct alleged and the nature of the attendant circumstances. Id. Based on the record below, the defendant had only addressed the former. Id. Because of the defendant's failure to address the nature of the attendant circumstances, Fukagawa held that the trial court did not abuse its discretion in refusing to find the offense a de minimis violation. Id. Fukagawa could not have dealt with waiver, as the court's holding was not based on any affirmative argument made by the prosecution. Id. Instead, this court ruled only that the evidence provided by the defendant was legally insufficient. Id.

Dow is even less relevant to the present case. 96 Hawaiʻi at 323, 30 P.3d at 929. In Dow, the trial court held that recorded test result of "19% mgm Ethanol per cc" supported a DUI conviction. Id. The trial court erred by concluding that the written result was the equivalent of a blood alcohol content

of .19 -- in fact, the recorded result was expressed using the wrong unit of measure.  Id.  Nevertheless, this court noted that "the record indicates that the recorded test result was not the only evidence presented at the time of trial."  Id.

The record also contained additional evidence presented by the State at trial, including the testimony of the medical technician that the results of the blood-alcohol test were "a .20 and a .19," and the testimony of two lay witnesses that the defendant's eyes were bloodshot and he smelled of alcohol.  Id. at 325, 30 P.3d at 931.  On the basis of the additional evidence presented at trial, this court affirmed the decision of the trial court.  Id.  The State could not have waived the arguments eventually relied on by this court, because this court's decision was based on the additional evidence presented by the State at trial.

Similarly, in Poe, this court held that "where the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling" only after adopting an alternative argument that the prevailing party presented to the trial court.  87 Hawaiʻi at 197, 953 P.2d at 575.  Poe consolidated two cases before the Hawaiʻi Labor Relations Board.  In the first, the State argued the plaintiff's employer had designated him as an essential employee, and the board disagreed.  Id. at 194, 953 P.2d at 572.  In the second case, the plaintiff argued that because he was not

11

an essential employee, his employer had engaged in a prohibited practice by refusing to allow him to strike. Again, the board disagreed. Id.

On appeal, this court ruled that the board's first decision was incorrect -- the plaintiff was indeed an essential employee. Id. at 196, 953 P.2d at 574. Because the plaintiff was an essential employee, it became impossible for the plaintiff's employer to have engaged in prohibited labor practices, and therefore this court affirmed the second decision of the board on this new ground. Id. at 196-97, 953 P.2d at 574-75. The argument regarding the plaintiff's status as an essential employee could not have been waived, because the labor board had addressed it in the plaintiff's initial case. Id. at 194, 953 P.2d at 572. In sum, Fukagawa, Dow, and Poe provide no support for the State's position that it can raise an argument for the first time on appeal because it prevailed in the trial court.

IV.

Although the State may have waived its strict liability argument, because of the likelihood that this case will be retried, and because this court accepted transfer due to the public importance of clarifying the charging requirements in an excessive speeding case, the appropriate resolution of this issue is discussed.

12

A.

The State argues that the language of HRS § 291C-105(a) is absolute on its face because it states that "no person" shall drive at a speed exceeding the statute's limits. According to the State, "no" is ordinarily defined as "not any," or "not one." (Quoting Webster's New World Dictionary 919 [sic].) The State maintains that if only persons who intentionally, knowingly, or recklessly drive at speeds exceeding the statute's limits could be charged under the statute, it would no longer be true that "all" persons would be prohibited from exceeding the statute's speed limits. Therefore, the State argues, the unqualified language in HRS § 291C-105(a) can only be given effect if the statute imposes strict liability. On this basis, the State argues that the language of HRS § 291C-105(a) meets the requirements of HRS § 702-212,[5] because "a legislative purpose to impose absolute liability . . . plainly appears."

In support of its strict liability argument, the State relies on the Commentary to HRS § 702-212. According to the

---

[5]    HRS § 702-212 provides in relevant part as follows:

> The state of mind requirements prescribed by sections 702-204 and 702-207 through 702-211 do not apply to:
> (1)    An offense which constitutes a violation, unless the state of mind requirement involved is included in the definition of the violation or a legislative purpose to impose such a requirement plainly appears; or
> (2)    A crime defined by statute other than this Code, insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears.

(Emphasis added.)

13

State, although the Commentary notes that "[o]ften regulatory statutes are absolute on their face when it is doubtful that absolute criminal liability was intended," it also provides examples of several pre-1968 statutes that did impose absolute liability.  (Quoting Commentary to HRS § 702-212 nn.1, 3.) According to the Commentary, two examples of statutes that did impose absolute liability were HRS § 453-14 (1968),[6] requiring the reporting of knife and bullet wounds within twenty-four hours, and HRS § 403-146 (1968),[7] which prohibited officers or directors of banks from delivering guaranties or endorsements which the bank could not legally make.  In contrast, the Commentary lists HRS §§ 403-141 (1968),[8] 403-142 (1968),[9] and

---

[6]     HRS § 453-14 provided in relevant part as follows:

        Every physician and surgeon attending or treating a case of knife wound, bullet wound, gunshot wound, powder burn, or any injury that would seriously maim, produce death, or has rendered the injured person unconscious, caused by the use of violence or sustained in a suspicious or unusual manner . . . , shall report such case to the chief of police.

(Emphases added.)

[7]     HRS § 403-146 provided in relevant part as follows

        Any officer, director, or agent of a bank who makes or delivers any guaranty or indorsement on behalf of the bank whereby it may become liable on any of its discounted notes, bills, or obligations, in any sum beyond the amount of loans and discounts which the bank may legally make, shall be fined not more than $1,000 or imprisoned not more that one year, or both.

(Emphases added.)

[8]     HRS § 403-141 provided in relevant part as follows:

        Any officer, director, or employee of a bank who wilfully or knowingly subscribes to or makes or causes to be made any false statement or report to the director of
(continued...)

14

403-147 (1968)[10] as statutes that, although appearing absolute on their faces, do not impose strict liability.

The State observes that in all of the statutes the Commentary notes as imposing strict liability, the statute begins

[8](...continued)
regulatory agencies, or any false entry in the books or accounts of the bank; or who <u>knowingly</u> subscribes to or exhibits false papers with the <u>intent to deceive</u> any person authorized to examine into the affairs of the bank or its directors; or who <u>knowingly states</u> or publishes any false report or statement of the bank or prepares any false minutes, with <u>intent to deceive</u> any examiner or any person authorized to examine the affairs of the bank or the directors thereof; or who fails to make proper entry upon the books or records of the bank; to disclose the true condition of the bank; or who makes any entry upon the books or records of the bank with intent to deceive or conceal the true condition thereof; shall be fined not more than $1,000 or imprisoned not more than two years, or both.

(Emphases added.)

[9]    HRS § 403-142 provided in relevant part as follows:

<u>Any</u> officer, director, employee, or agent of a bank who makes a false or misleading entry or <u>wilfully omits</u> to make entry in any book, report, or statement of the business, affairs, or condition, in whole or in part, of the bank, with respect to any matter particularly pertaining to the business with intent to deceive or conceal the true condition of the business from any officer, director, or any agent, examiner, or other person employed or lawfully appointed to examine into the condition of any of its affairs, or any public officer, office, or board to whom or which the bank is required by law to report, or having authority by law to examine into any of its affairs, or who, with like intent, causes, aids, or abets any other person to make any false entry or to fail to make a requisite entry, shall be fined not more than $1,000 or imprisoned not more than two years, or both.

(Emphases added.)

[10]    HRS § 403-147 provided in relevant part as follows:

<u>Any</u> officer or director of a bank who, in case of the fraudulent insolvency of the bank, has participated in the fraud, or any officer or director who <u>wilfully</u> does any act, as such officer or director, which is expressly forbidden by law, or <u>wilfully</u> omits to perform any duty imposed upon him as such officer or director by law, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

(Emphases added.)

15

with unqualified language ("every" or "any") and contains no further qualification.  In contrast, the State maintains that the Commentary's examples of statutes that do not impose strict liability, although beginning with the same unqualified language, are subsequently qualified by terms such as "wilfully" or "knowingly."  From this, the State infers a general rule that whenever a statute begins with unqualified language, and contains no further qualifying language, the requirement imposed by HRS § 702-212 is met, and a legislative purpose to impose absolute liability plainly appears.

The State further compares HRS § 291C-102 (2011),[11] enacted in 1973, to the statute at issue in this case, HRS § 291C-105.  According to the State, while HRS § 291C-102, which provides penalties for ordinary speeding offenses, contains no unqualified language and is not punishable by incarceration,[12]

---

[11]     HRS § 291C-102 provides, in relevant part as follows:

        (a) <u>A person violates this section</u> if the person drives:
            (1)    A motor vehicle at a speed greater than the maximum speed limit other than provided in section 291C-105; or
            (2)    A motor vehicle at a speed less than the minimum speed limit,
        where the maximum or minimum speed limit is established by county ordinance or by official signs placed by the director of transportation on highways under the director's jurisdiction.
        (b) If the maximum speed limit is exceeded by more than ten miles per hour, a surcharge of $10 shall be imposed, in addition to any other penalties, and shall be deposited into the neurotrauma special fund.

(Emphasis added.)

[12]     The penalty for a violation of HRS § 291C-102 is set by HRS § 291C-161 (2011).  HRS § 291C-161 provides in relevant part as follows:
(continued...)

16

HRS § 291C-105, which provides penalties for excessive speeding, does contain unqualified language and provides more significant penalties, including the possibility of incarceration. The State reasons, therefore, that "it is reasonable to infer that the legislature intended to emphasize the more severe penalties imposed by HRS § 291-105(c) to apply to every person found to violate HRS § 291-105(a), regardless of a person's state of mind."

B.

Defendant argues in his Reply that "there is no express language in HRS § 291C-105(a) to indicate the legislature's intent to make excessive speeding an absolute liability crime." Examining the legislative history of HRS § 291C-105(a), Defendant argues that "nowhere in the accompanying committee reports is there even the mere suggestion that the legislature intended to impose absolute liability on excessive speeding."

---

[12](...continued)
        (a) It is a violation for any person to violate any of the provisions of this chapter, except as otherwise specified in subsections (c) and (d) and unless the violation is by other law of this State declared to be a felony, misdemeanor, or petty misdemeanor.
        (b) Except as provided in subsections (c) and (d), every person who is determined to have violated any provision of this chapter for which another penalty is not provided shall be fined:
                (1)    Not more than $200 for a first violation thereof;
                (2)    Not more than $300 for a second violation committed within one year after the date of the first violation; and
                (3)    Not more than $500 for a third or subsequent violation committed within one year after the date of the first violation.

(Emphases added.)

V.

Both HRS § 702-212 and its commentary suggest that a strong showing is required before courts interpret a statute as imposing strict liability. The commentary to HRS § 702-204 states that a "state of mind [ ] will, in most instances, be required for the imposition of penal liability[,]" and, consequently, HRS § 702-212 "provides for those relatively few instances when absolute or strict liability will be recognized." (Emphasis added.) Thus, HRS § 702-212 states that, for "crime[s] defined by statute other than [the HPC]," the states of mind specified by the HPC "do not apply . . . insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears." (Emphasis added.)

Previous decisions have construed the language of HRS § 702-212 as interpreting penal statutes as strict liability offenses only if (1) the statutory language "expressly impos[es] absolute liability," State v. Eastman, 81 Hawaiʻi 131, 140, 913 P.2d 57, 60 (1996) (citing State v. Rushing, 62 Haw. 102, 105, 612 P.2d 103, 106 (1980)), or (2) the legislative history "unequivocally indicates" an intent to eliminate the state of mind requirement. State v. Buch, 83 Hawaiʻi 308, 316, 926 P.2d 599, 607 (1996) (holding that the legislature plainly intended to impose strict liability when the legislative history indicated that the law had been amended to "eliminate the requirement of

18

actual knowledge"); see also State v. Nesmith, 127 Hawaiʻi 48, 59, 276 P.3d 617, 628 (2012). (holding that the legislature plainly intended to impose strict liability for drunk driving offenses based on the statute's legislative history).

Neither the statutory language nor the legislative history can support the imposition of strict liability in this case. The State's argument that a statute "expressly imposes" strict liability when it uses unqualified language such as "every," "any," or "no person" is precluded by Rushing. In that case, the section of the statute at issue also used unqualified language, without a subsequent reference to "wilfully" or "knowingly."[13] Nevertheless, this court rejected any contention that the language alone could support a finding of strict liability, holding that "we do not find the legislative purpose to impose absolute liability plainly to appear from the wording of HRS § 346-34." Rushing, 62 Haw. at 105, 612 P.2d at 106.

Moreover, if unqualified language standing alone plainly demonstrated a legislative intent to impose strict

---

[13]    The statute at issue in Rushing provided in relevant part:

> If, at any time while the recipient of public assistance is receiving such assistance, his living requirements are reduced and he fails to report the reduction within thirty days from the date of the reduction to the department, or he acquires from any source real property, funds, income, or other resources and fails to report the amount of same together with the source of the resources to the department within thirty days of receipt of same, or prior to spending or otherwise disposing of all or any portion of the same, he shall be deemed guilty of fraud.

62 Haw. at 103, 612 P.2d at 104 (quoting HRS § 346-34 (1976)) (emphases added).

19

liability, dozens of statutes would be transformed into strict liability offenses.  See, e.g., HRS § 6E-10 (2011)[14] (construction on privately owned historic property), HRS § 21-15(c) (2011),[15] and HRS §§ 21-12(g), (h) (2011),[16] (violations of legislative confidentiality), HRS § 46-45 (2011)[17] (preventing county

---

[14]     HRS § 6E-10 provides in relevant part as follows:

(a) Before any construction . . . by, for, or permitted by a private landowner may be commenced which will affect an historic property on the Hawaiʻi register of historic places, the landowner shall notify the department of the construction . . . and allow the department opportunity for review of the effect of the proposed construction . . .
. . . . .
(c) Any person, natural or corporate, who violates the provisions of this section shall be fined not more than $1,000, and each day of continued violation shall constitute a distinct and separate offense under this section for which the offender may be punished.

(Emphases added.)

[15]     HRS § 21-15(c) provides in relevant part as follows:

Any person other than the witness concerned or the witness' counsel who violates subsection 21-12(g) or (h) shall be fined not more than $500 or imprisoned not more than six months, or both.

(Emphasis added.)

[16]     HRS § 21-12 provides in relevant part as follows:

(g) Testimony and other evidence given or adduced at a hearing closed to the public shall not be made public unless authorized by majority vote of all of the members of the committee, which authorization shall also specify the form and manner in which the testimony or other evidence may be released.
(h) All information of a defamatory or highly prejudicial nature received by or for the committee other than in an open or closed hearing shall be deemed to be confidential.  No such information shall be made public unless authorized by majority vote of all of the members of the committee for legislative purposes, or unless its use is required for judicial purposes.

[17]     HRS § 46-45 provides in relevant part as follows:

No council, or other board, committee, department,
(continued...)

20

employees from spending money without prior appropriation), HRS §
142-61(f) (2011)[18] (regulating electric fences), HRS § 142-95
(2011)[19] (keeping Belgian hares off of the ground), HRS § 142-96
(2011)[20] (frightening animals and endangering others), HRS § 264-

---

[17](...continued)
bureau, officer, or employee of any county shall expend, or
aid or participate in expending, during any period of time
for any purpose, except for and in the exercise by the
county of the power of eminent domain, any sum in the
absence of an appropriation for the purpose for the period,
or any sum in excess of an appropriation, if any, for the
purpose for the period, or incur, authorize, or contract, or
aid or participate in incurring, authorizing, or
contracting, during any fiscal year, liabilities or
obligations, whether payable during the fiscal year or not,
for any or all purposes, except for and in the exercise by
the county of the power of eminent domain, in excess of the
amount of money available for the purposes for the county
during the year.  Any person who violates this section shall
be fined not more than $1,000 or imprisoned not more than
one year, or both.

(Emphases added.)

[18]    HRS § 142-61(f) provides in relevant part as follows:

Any person who constructs or maintains an electrically
charged fence or fence with electrically charged attachments
not conforming to the requirements of this section shall be
fined not more than $500, or imprisoned not more than one
year, or both.

(Emphases added.)

[19]    HRS § 142-95 provides in relevant part as follows:

Any person who breeds, raises or keeps rabbits or
Belgian hares shall keep them off the ground.
Any person who violates this section shall be fined
not more than $100 or imprisoned not more than six months,
or both.

(Emphases added.)

[20]    HRS § 142-96 provides in relevant part as follows:

Whoever frightens, exasperates, or animates a horse or
other animal, and thereby endangers the personal safety or
the personal property of any person, or the animal itself,
being that of another, shall, in case the personal safety of
any person is thereby imminently endangered, be fined not
less than $5 nor more than $500; or in case the personal
(continued...)

12 (2011)[21] and HRS § 264-6 (2011)[22] (preventing persons from breaking up or "disturbing" state highways), HRS § 448-3(a) (2011)[23] (preventing the employment of unlicensed dental practitioners). Many of these statutes impose significant prison sentences for their violation. Such widespread application of

---

[20](...continued)
        safety of any person is not so endangered, be fined not less
        than $5 nor more than $100.

(Emphasis added.)

[21]     HRS § 264-12 provides in relevant part as follows:

            Any person, including any public officer or employee
        who violates section 264-6, shall be fined not more than
        $250 or imprisoned not more than three months, or both.

(Emphases added.)

[22]     HRS § 264-6 provides in relevant part as follows:

            No person or government agency, whether federal,
        state, or county, shall, in any manner or for any purpose do
        any of the following acts without a written permit from the
        director of transportation or the director's authorized
        representative:
            (1)     Break up, dig up, disturb, undermine or dig
                    under, or cause to be broken up, dug up,
                    disturbed, undermined, or dug under, the
                    right-of-way of any state highway; or
            (2)     Place, erect, leave, or store any structure,
                    motor or other vehicle, equipment, or any other
                    object wholly or partially within the
                    right-of-way of any state highway; provided that
                    this paragraph shall not apply to the holding or
                    displaying of movable signs, for the purpose of
                    carrying on political campaign activities.

[23]     HRS § 448-3(a) provides in relevant part as follows:

            Except as provided in section 447-3, no person who
        manages or conducts as manager, proprietor, conductor, or
        otherwise a place where dental operations are performed,
        shall employ any person as operator in dental surgery or as
        a practitioner, or cause to permit any person to so act, who
        is not duly licensed to practice dentistry; provided that
        nothing in this chapter shall prohibit any unlicensed person
        from performing merely mechanical work upon inert matter in
        a dental laboratory.

(Emphasis added.)

strict liability cannot be reconciled with the Commentary to HRS § 702-212, which counsels that strict liability "should not be discerned lightly by the courts," that HRS § 702-212(2) "severely limits the situations which will allow the imposition of absolute criminal liability," and that "strict liability in the penal law is indefensible in principle if conviction results in the possibility of imprisonment." Commentary to HRS § 702-212.

Finally, the State's argument that a comparison between HRS § 291C-102 and HRS § 291C-105 supports the imposition of strict liability is contradicted by the Commentary to HRS § 702-212. The State argues that because HRS § 291C-105 imposes stricter penalties than HRS § 291C-102, and because only HRS § 291C-105 utilizes unqualified language, it is reasonable to infer that the legislature intended that the more severe penalties in HRS § 291C-105 apply regardless of a defendant's state of mind. As the State notes, violations of HRS § 291C-105 may be punished by imprisonment, although violations of HRS § 291C-102 may not. To reiterate, the Commentary to the HPC suggests that "absolute or strict liability in the penal law is indefensible in principle if conviction results in the possibility of imprisonment and condemnation." Commentary to HRS § 702-212. Thus, contrary to the State's position, the fact that HRS § 291C-105 carries stricter penalties, including the possibility of imprisonment, is in fact evidence that the legislature did not intend to make HRS § 291C-105(a) a strict liability offense.

Because the statute's use of "no person," standing alone, is insufficient to impose strict liability, and no other language in the statute refers to strict liability, the State's argument that the statutory language demonstrates that HRS § 291C-105 is absolute on its face must be rejected.

Moreover, the State cannot rely on the legislative history of HRS § 291C-105(a) to demonstrate that excessive speeding is a strict liability offense. In both its Application for Transfer and its Answering Brief, the State eschews any reliance on the statute's legislative history, and instead argues solely from the plain language of the statute. ("[N]o Hawaiʻi appellate court has yet addressed whether absolute liability may 'plainly appear' from the language of the statute itself.")(emphasis added). Further, nothing in the legislative history of HRS § 291C-105(a) "unequivocally indicates" an intent to impose strict liability. Buch, 83 Hawaiʻi at 316, 926 P.2d at 607; see also State v. Wells, 78 Hawaiʻi 373, 376, 894 P.2d 70, 73 (1995) ("[I]n determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate[,] but may look to relevant legislative history.") (internal quotation marks, brackets and citations omitted.)

In 2006, the legislature enacted HRS § 291C-105, which for the first time provided additional penalties to drivers who exceeded the speed limit by more than thirty miles per hour, or

24

who drove faster than eighty miles per hour. The relevant legislative history demonstrates a legislative intent to "define excessive speeding as exceeding the speed limit by [twenty-five] miles per hour[24] or driving eighty miles per hour or more irrespective of the speed limit," Conf. Comm. Rep. No. 57-06, in 2006 House Journal, at 1796, to "improve public safety" by "creating severe penalties for those who drive at excessive speeds," id., and to "clamp down on highway speeding and racing." 2006 House Journal, at 939 (statement of Rep. Caldwell). None of these statements demonstrate a clear intent to make excessive speeding a strict liability crime.

In creating the offense of excessive speeding, the legislature intended to "fix or mark the limits" of the offense at speeds of thirty miles per hour greater than the posted speed limit, or at speeds of eighty miles per hour, irrespective of the speed limit. Demarcating the offense of excessive speeding from ordinary speeding does not indicate an intent to omit a state of mind requirement from the law. It only demonstrates an intent to set the parameters at which a defendant meeting the applicable state of mind requirement may be found guilty.

The remaining legislative history, which indicates an intent to "improve public safety" and "clamp down on highway speeding or racing" makes no reference to omitting a state of

---

[24]    The conference committee would change this limit to thirty miles per hour in the final bill.  Conf. Comm. Rep. No. 57-06, in 2006 House Journal, at 1796.

mind requirement or precluding any defenses to excessive speeding. The legislative history demonstrates only an intent to punish severely those who are ultimately found guilty, not to increase the class of guilty persons to those lacking any culpable mental state.[25] Consequently, the legislative history of HRS § 291C-105 does not support the conclusion that HRS § 291C-105(a) is a strict liability offense.

In sum, neither the plain language of the statute nor the legislative history supports the State's contention that HRS § 291C-105(a) is a strict liability offense. Buch, 83 Hawaiʻi at 316, 926 P.2d at 607. Therefore, HRS § 702-204 applies to HRS § 291C-105(a), and in future cases the State must prove that a defendant acted intentionally, knowingly, or recklessly. Id.

VI.

As discussed above, HRS § 291C-105(a) is not a strict liability offense, but instead requires that the State prove that a defendant acted intentionally, knowingly, or recklessly. The State concedes that, if HRS § 291C-105(a) contains a mens rea requirement, then the oral charge is insufficient pursuant to Nesmith. In this case, as in Nesmith, the defendant objected to

---

[25] In 2008, the legislature amended several statutes, including HRS § 291C-105, to impose additional fees which would be paid to the Trauma System Special Fund. 2008 Haw. Sess. Laws Act 231, § 16 at 846-47. Although the legislative history to the amendment indicates an intent to "establish additional funding mechanisms to enhance the availability of revenues in the Trauma System Special Fund," Conf. Comm. Rep. No. 172-08, in 2008 Senate Journal, at 871, and to "impose higher penalties and fines on irresponsible and dangerous drivers," 2008 Senate Journal, at 684 (statement of Sen. Baker), nothing indicates an intent to modify the underlying state of mind requirement for HRS § 291C-105.

the failure to allege the requisite state of mind at trial.  See Nesmith, 127 Hawaiʻi at 51, 276 P.3d at 620.  In Nesmith, this court reasoned that "state of mind requirements, though not an element of an offense" were required to be included in the charges against the defendants in order "to alert the defendants of precisely what they needed to defend against to avoid a conviction." 127 Hawaiʻi at 56, 276 P.3d at 625 (internal quotation marks and citations omitted).  Nesmith held that state of mind must be included in a charge or the case must be dismissed without prejudice.  Id. at 54, 276 P.3d at 623.  Because the charge here did not contain the requisite state of mind, as the State concedes, Nesmith mandates dismissal without prejudice.

## VII.

Due to the likelihood of retrial on remand, Defendant's argument that the State failed to lay an adequate foundation for the introduction of the speed reading from the laser gun is addressed to prevent further error.

### A.

With respect to his second point of error, Defendant contends that, in order to lay an adequate foundation for the introduction of a speed reading from a laser gun, the State must demonstrate (1) that the laser gun's accuracy was tested according to manufacturer recommended procedures and determined to be operating properly prior to use, and (2) that the nature

27

and extent of the officer's training in the operation of laser guns meets the requirements indicated by the manufacturer. (Citing Assaye, 121 Hawaiʻi at 213-15, 216 P.3d at 1236-38.) Defendant argues that the State met neither of the foundational requirements.

1.

As to (1), Defendant argues that the evidence introduced at trial demonstrates only that Officer Franks followed the procedures for testing the laser gun contained in his manual, and does not demonstrate that the manual or the procedures therein were sanctioned by LTI (the laser gun's manufacturer).  Therefore, Defendant argues that introduction of the laser gun's reading violates Assaye, which held that a foundation for the accuracy of a particular laser gun must be laid through a demonstration that the officer using the gun has complied with "'accepted procedures' for testing the accuracy of a particular laser gun," which are "recommended by the manufacturer."  (Quoting 121 Hawaiʻi at 213, 216 P.3d at 1236.)

In connection with this argument, Defendant challenges Officer Franks' testimony on cross-examination, wherein he stated that LTI representatives reviewed his manual and that his manual contained identical information to that offered by the LTI representatives.  Defendant argues that this testimony contained out-of-court communicative statements offered to prove

28

substantive facts, and therefore "was inadmissible hearsay without an applicable exception." As such, Defendant argues, it constituted plain error for the trial court to have considered such evidence.

Finally, Defendant points out that on direct examination, the State asked Officer Franks whether the tests in his manual established that the laser gun was "working properly." According to Defendant, this proves that "[a]t best, Officer Franks demonstrated that they were tests to establish that the laser gun was working properly, not accurately." (Citing Assaye, 121 Hawaiʻi at 215, 216 P.3d at 1238.) (Emphases in original.)

2.

In response, the State distinguishes Assaye by arguing that in that case there was no evidence which could demonstrate that the calibration tests performed were recommended by the manufacturer. Here, however, Officer Franks testified that the tests were set forth in a manual from LTI, bearing the manufacturer's copyright. Further, the information contained in the manual corresponded to information provided by the representatives of the manufacturer, and those representatives reviewed Officer Franks' manual. Thus, the State urges, sufficient evidence exists to support the court's decision that the calibration tests provided by the manual were recommended by the manufacturer.

3.

Defendant cannot establish that the court abused its discretion by ruling that the laser gun's accuracy was tested according to procedures recommended by the manufacturer, as several facts in the record support this conclusion. See Assaye, 121 Hawaiʻi at 210, 216 P.3d at 1233 ("When a question arises regarding the necessary foundation for the introduction of evidence, the determination of whether proper foundation has been established lies within the discretion of the trial court, and its determination will not be overturned absent a showing of clear abuse."). It is undisputed that Officer Franks possessed a manual that recommended four procedures to verify the accuracy of the laser gun, and that Officer Franks did in fact observe those procedures. The only issue is whether the State demonstrated that the manual containing the procedures was provided by LTI, the laser gun's manufacturer. Officer Franks testified at trial that the manual was "from [LTI]." Further, on cross-examination, Officer Franks related that the manual bore the LTI copyright, that it was reviewed by LTI personnel, and that information provided by the same LTI personnel was "covered in the manual we use to train on." Based on this testimony, it was within the court's discretion to conclude that the manual was provided by the manufacturer and, therefore, the procedures contained therein were recommended by the manufacturer.

This conclusion is not altered by Defendant's contention that some parts of Officer Franks' testimony -- his testimony that the manual was reviewed by LTI personnel and that LTI personnel provided similar information to that covered in Officer Franks' manual -- were inadmissible hearsay.  Although the transcript provides few details, it appears that the evidence adduced was not hearsay.  The testimony that LTI personnel "reviewed" the manual, is not hearsay because in reviewing the manual it does not appear that the LTI personnel intended to communicate any assertion regarding the manual.  See Commentary to Hawaiʻi Rules of Evidence (HRE) Rule 801 (2011) ("[M]uch nonverbal conduct, although tending logically to prove the actor's belief in an event or condition, is not motivated by the intent to assert that belief and should not be considered hearsay.").

Further, the assertion that the information provided by LTI representatives corresponded to the information in the manual was offered not for the truth of the matter asserted, but only to prove the similarity between information provided by LTI personnel and information contained in the manual.  Because the only significance of the statement was the fact that it was made, the statement does not fall within the scope of the hearsay rule. See Island Directory Co. v. Iva's Kinimaka Enterprises, 10 Haw. App. 15, 21, 859 P.2d 935, 939 (1993) ("If the significance of an offered statement lies solely in the fact that it was made, no

31

issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

Finally, although the State asked Officer Franks on direct examination whether or not the laser gun was working "properly," and not "accurately," the State nevertheless established that the procedures performed by Officer Franks demonstrate the gun's accuracy, as required by Assaye. Because the purpose of the laser gun is to measure the speed of vehicles accurately, asking whether or not the gun is working properly amounts to asking whether or not it is accurate. Thus, Defendant did not show that the court abused its discretion by finding that the tests recommended by the manufacturer supported the gun's accuracy.

B.

1.

As to (2), Defendant notes that in Assaye, this court held that the prosecution must also demonstrate that an officer is qualified by training to operate the laser gun in order to lay an adequate foundation for the readings taken from the gun. (Citing 121 Hawaiʻi at 215, 216 P.3d at 1238.) According to Defendant, the State must demonstrate that "the nature and extent of an officer's training in the operation of a laser gun meets the requirements indicated by the manufacturer." Here, Defendant argues that no evidence was provided regarding the nature and extent of the training requirements set forth by LTI, and, as the

record is silent on this issue, the State could not possibly have demonstrated that Officer Franks' testimony met whatever requirements were established by the manufacturer.

2.

In response, the State distinguishes <u>Assaye</u> by arguing that the holding of <u>Assaye</u> was nothing more than "it is difficult to discern how anyone can use the laser gun properly without any training or instruction." Thus, the State concedes that "testimony amounting merely to being certified to use the laser gun without explaining the nature and extent of the training involved to become certified is insufficient for foundational purposes." However, the State argues that testimony that Officer Franks' training consisted of four hours of operator training and further supplemental training is sufficient to support the court's decision that Officer Franks was trained properly in the laser gun's use.

3.

The record indicates the court abused its discretion by ruling that the State introduced evidence sufficient to establish that Officer Franks' training met the requirements set by the manufacturer. The State introduced no evidence regarding the manufacturer's requirements, and therefore, regardless of the extent of Officer Franks' training, the court could not have properly concluded that the manufacturer's requirements were met.

To lay a sound foundation for the introduction of a reading from a laser gun, Assaye requires the prosecution to demonstrate that "the nature and extent of an officer's training in the operation of the laser gun meets the requirements indicated by the manufacturer." Assaye, 121 Hawaiʻi at 215, 216 P.3d at 1138. Logically, to meet this burden the prosecution must establish both (1) the requirements indicated by the manufacturer, and (2) the training actually received by the operator of the laser gun.

Here, at trial the State only provided evidence of the extent of Officer Franks' training. Although the State explained that Officer Franks received four hours of training in 2003, and further training in 2009 and 2010, the record is silent as to what type of training is recommended by the manufacturer. Without a showing as to the manufacturer's recommendations, the court could not possibly have determined whether the training received by Officer Franks met "the requirements indicated by the manufacturer." Id.

VIII.

Based on the foregoing, we vacate the court's June 2, 2011 judgment of conviction and order the charge dismissed without prejudice, because HRS § 291C-105(a) is not a strict liability offense, and the oral charge failed to allege the requisite states of mind. As a retrial is likely, we also conclude that the State failed to lay a proper foundation for the

34

speed reading by not introducing any evidence of the
manufacturer's training requirements.

Brandon H. Ito,                   /s/ Mark E. Recktenwald
for petitioner
                                  /s/ Paula A. Nakayama
Trisha Y. Nakamura,
for respondent                    /s/ Simeon R. Acoba, Jr.

                                  /s/ Sabrina S. McKenna

                                  /s/ Michael D. Wilson

