319 P.3d 1178

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**John N. AMIRAL, Petitioner/Defendant–Appellant.**

**No. SCWC–11–0000374.**

Supreme Court of Hawai'i.

Feb. 13, 2014.

individual argument that is not presented in compliance with HRAP Rule 28.

Kevin O'Grady, Honolulu, for petitioner.

ACOBA, McKENNA, and POLLACK, JJ., with RECKTENWALD, C.J., concurring, with whom NAKAYAMA, J. joins.

Opinion of the Court by POLLACK, J.

Petitioner/Defendant–Appellant John Amiral (Amiral) seeks review of the Intermediate Court of Appeals' (ICA) May 31, 2013 Judgment (ICA Judgment), filed pursuant to its April 30, 2013 Summary Disposition Order, affirming the Notice of Entry of Judgment and/or Order and Plea/Judgment (Judgment) entered by the District Court of the First Circuit, 'Ewa Division (district court) on April 12, 2011. For the reasons set forth herein, we vacate the ICA Judgment and the district court Judgment and remand the case to the district court for further proceedings.

## I. BACKGROUND

### A. Pre–Trial Proceedings

On July 26, 2010, Honolulu Police Department (HPD) Officer Zenas Ondayog issued a citation to Amiral for driving his vehicle sixty-five miles per hour in an area where the posted speed limit was fifty miles per hour.

The State of Hawai'i (State) filed a Notice of Traffic Infraction on July 28, 2010, charging Amiral with the offense of Exceeding the Speed Limit in violation of Hawai'i Revised Statutes (HRS) § 291C–102 (2007).[1]

---

1. HRS § 291C–102 provides:

   **Noncompliance with speed limit prohibited.** (a) A person violates this section if the person drives:

   (1) A motor vehicle at a speed greater than the maximum speed limit other than provided in section 291C–105; or

   (2) A motor vehicle at a speed less than the minimum speed limit, where the maximum or minimum speed limit is established by county ordinance or by official signs placed by the director of transportation on highways under the director's jurisdiction.

   (b) If the maximum speed limit is exceeded by more than ten miles per hour, a surcharge of $10 shall be imposed, in addition to any other penalties, and shall be deposited into the neurotrauma special fund.

Amiral submitted via mail his Answer to Notice of Traffic/Parking Infraction form (Answer), which was filed on September 1, 2010. In his Answer, Amiral denied the charge and contested it by submission of a written statement.

In his written statement, Amiral contended that Officer Ondayog wrongfully issued a citation to him, as the Officer failed to indicate on the citation that the "device/speedometer was accurate, tested, [and] working properly." [2]

On October 7, 2010, the district court held a "Chambers Review" regarding the charge against Amiral for Exceeding the Speed Limit.[3] Having reviewed Amiral's written statement, the district court ruled in favor of the State and issued its Judgment and Notice of Entry of Judgment. The district court imposed a $75 fine, a $7 driver education assessment, a $10 neurotrauma surcharge, and a $40 administrative fee.

Amiral filed a Request for Trial on November 8, 2010. December 8, 2010, Amiral sent the State a Request for Disclosure, requesting all documents related to Officer Ondayog's Laser Technology Incorporated (LTI) UltraLyte 20–20 laser gun (UltraLyte), including the manual, maintenance logs, and Officer Ondayog's training in the use of the UltraLyte.

After receiving Amiral's Request for Disclosure, the State responded that the information requested by Amiral was either not available to their office or not discoverable under Hawai'i Rules of Penal Procedure (HRPP) Rule 16 (2010).

Amiral filed a Motion to Compel arguing that the documents he requested from the State were discoverable under HRPP Rule 16 as material that "tends to negate the guilt of the defendant as to the offense charged."

On January 11, 2010, the district court held a hearing on Amiral's Motion to Compel and ordered that the State allow defense counsel to review and make one copy of the following: (1) "Marksman instructor manual"; (2) "Marksman (trainee) manual"; (3) "LTI UltraLyte operator (user) manual"; and (4) "LTI Marksman operator (user) manual."

## B. Trial Proceedings

The district court held a bench trial on April 12, 2011.[4] Prior to the commencement of trial the district court addressed outstanding discovery matters. Defense counsel argued that although he had a copy of the UltraLyte manual from a prior trial, the State failed to produce all of the other documents that were requested by Amiral's Motion to Compel. The district court found that since defense counsel had a copy of the manual and Amiral's motion had been ruled upon by the prior judge, it was not necessary to address the discovery issue further and proceeded with trial.

Officer Ondayog, who testified for the State, was the only witness. At approximately 7:34 a.m., on July 26, 2010, he was conducting speed enforcement of the westbound traffic along Moanalua Freeway, where the posted speed limit was fifty miles per hour. At the same time, Amiral was driving his vehicle westbound on Moanalua Freeway. As Amiral's vehicle approached his vantage point, Officer Ondayog observed that Amiral's vehicle was traveling at a higher rate of speed than the other vehicles in the flow of traffic and aimed his LTI UltraLyte at Amiral's vehicle.

Officer Ondayog indicated that in January 2002 he was trained and certified in the use of the UltraLyte by HPD Sergeant Ryan Nishibun at the police academy. On Novem-

---

**2.** In his written statement, Amiral also contended that Officer Ondayog: (1) erred in writing on the citation that Amiral was a "Navy Captain" as his uniform reflected that he was a "Navy Lieutenant"; (2) failed to properly identify himself on the citation as his name and identification number were illegible; and (3) was not "professional" in his behavior. Amiral also attached copies of his (1) military orders to attend an annual training in Hawai'i on the date of the citation, (2) car rental invoice, (3) driving abstract for the State of Virginia, and (4) citation.

**3.** The Judgment and Notice of Entry of Judgment indicated that Amiral was not present at the October 7, 2010 hearing.

**4.** The district court allowed Amiral's counsel to waive Amiral's presence because Amiral was stationed in the State of Virginia at the time of trial.

ber 4, 2010, Officer Ondayog attended a "refresher course" on the use of the UltraLyte that was taught by HPD Officers Jeremy Franks and Ikaika Lee.

Both the training at the police academy and the "refresher course" consisted of a four-hour "lecture class" on the mechanics of the UltraLyte and four hours of "practice." Officer Ondayog recalled that there were thirty-two trainees in his class and none of the participants "failed" the course, as the course did not include a written or practical examination.

Officer Ondayog testified that he received a manual as a part of his training. He did not indicate whether the manual that he had been given and used for comparison was a: (1) "Marksman instructor manual"; (2) "Marksman (trainee) manual"; (3) "LTI UltraLyte operator (user) manual"; or (4) "LTI Marksman operator (user) manual."

The prosecutor asked Officer Ondayog if the instructions in the manual specified how to test the UltraLyte to verify that it was accurate and operating properly. Defense counsel objected on the basis of foundation and hearsay, arguing that Officer Ondayog did not have personal knowledge of the instructions in the manual. The district court initially sustained the objection, but later overruled the objection on the basis that "this is foundation for foundation because the training itself is foundation."

Over objection, Officer Ondayog testified that the instructions in the manual specified the tests to ensure that the UltraLyte is "working accurately and being operated properly," and his training in the use of the UltraLyte was based upon those instructions in the manual.

Officer Ondayog stated that he was trained to conduct the following four tests in order to verify that the UltraLyte is working properly: (1) the "self-test"; (2) the "display test"; (3) the "scope alignment test"; and (4) the "delta distance velocity test" (delta/distance test) or the "calibration test" (collectively "four tests") The "self-test" confirms that the lights on the display of the UltraLyte are working properly. In order to conduct the "self-test," Officer Ondayog explained that

"you need to depress the trigger of the [UltraLyte]. Four numerical 8's will display. If there is a numerical like 5-0 or a 5-5, ... the [display of the UltraLyte] is not working accurately."

The "display test" verifies that the lights on the display and the "test mode button" of the UltraLyte are working properly. The "display test" is conducted by pressing the "test mode button" on the UltraLyte. If a "TT" symbol and "four numerical 8's" appear on the display, then the "test mode button" and the lights on the display are working properly. Officer Ondayog testified that he conducts the "display test" before and after his shift.

The "scope alignment test" confirms that "the red dot within the center of the scope" and the UltraLyte laser are aligned. In order to conduct the "scope alignment test," Officer Ondayog aims and holds the trigger of his UltraLyte at a light pole while panning the pole horizontally and vertically. If the scope and laser are aligned, the UltraLyte makes a high-pitched clicking sound, which is the same sound the device makes while it is tracking a vehicle. Officer Ondayog acknowledged that "hearing different pitches is a subjective thing as opposed to if a green light came on and it said [the UltraLyte was] working[.]" Officer Ondayog testified that he conducts the "scope alignment test" prior to his shift and after every traffic stop, and has never had to adjust the scope of his UltraLyte.

With respect to the delta/distance test, Officer Ondayog utilizes two concrete pillars and a marked parking stall on the "P1" level of the parking structure at the HPD main station. Officer Ondayog testified that he personally measured the distances between the marked parking stall and the two pillars and found that the distance to the nearest pillar was 130 feet and the distance to the furthest pillar was 155 feet. Officer Ondayog explained that based on an internal calculation of the two fixed distances, the UltraLyte should display "50" to verify the accuracy of the device.

Defense counsel then had Officer Ondayog read part of the manual, which indicated that "[f]or uniformity [in conducting the delta/dis-

tance test], [the fixed distance] should be 175 feet from the shooting mark." Officer Ondayog acknowledged that the "[pillars] were [constructed] to hold up the parking garage," rather than to conduct the delta/distance test on his UltraLyte.[5]

As to the calibration of his UltraLyte, Officer Ondayog testified that had not sent his UltraLyte to the manufacturer for maintenance since receiving the device in 2009.[6] During this period, he also had not performed any maintenance on the UltraLyte other than to change the battery. Officer Ondayog explained, "I'm not an employee. I don't calibrate. I just conduct those four tests, that's it."

Officer Ondayog acknowledged that the UltraLyte was an electronic device that required software "to figure out what's going in to spit out some number on the display[,]" but he did not know what type of software his UltraLyte required in order to work properly or how the software works. Officer Ondayog testified that he had neither checked for the internal software revision number nor did he know how to locate it. Officer Ondayog also had not sent his Ultra-Lyte to the manufacturer for a software upgrade.

Officer Ondayog elaborated upon the usage and storage of his UltraLyte. On average, he stops more than forty cars a day when he conducts speed enforcement. Officer Ondayog testified that he had measured the speed of "hundreds of vehicles, maybe thousands[.]" When he is not using his UltraLyte, the device is stored in the trunk of his duty motorcycle.

On the date of the incident, Officer Ondayog performed the four tests on his Ultra-Lyte before his shift, "in accordance with LTI's recommended procedures[.]" Defense counsel objected based on lack of foundation, and the district court overruled the objection. Officer Ondayog testified that based on the results of the four tests he determined that the UltraLyte was in "good working condi-

tion." Upon triggering his UltraLyte on Amiral's vehicle, the device indicated that Amiral's vehicle was traveling sixty-five miles per hour. Although there were other vehicles in the area, Officer Ondayog testified that if the UltraLyte detected more than one vehicle then the device would display an error sign.

Officer Ondayog indicated that he operated the UltraLyte in accordance with his training and the manufacturer's recommended procedures when he triggered the UltraLyte on Amiral's vehicle. Again, defense counsel's objection as to lack of foundation was overruled.

On cross-examination, Officer Ondayog testified that he did not have personal knowledge of (1) "any tests that can be conducted on the [UltraLyte] that the manufacturer recommends that ensures it's operating as intended[,]" (2) "how those tests worked[,]" or (3) the "internal operation of the [Ultra-Lyte and] how it works." Officer Ondayog's knowledge of the four tests was based on his reading of the manual and his training.

Defense counsel then made an oral motion to strike Officer Ondayog's testimony on the basis that Officer Ondayog lacked independent knowledge that the four tests were recommended by the manufacturer to ensure that the UltraLyte was accurate and working properly. The district court allowed the State to conduct its redirect examination of Officer Ondayog before ruling on the defense's motion.

During redirect and re-cross examinations, Officer Ondayog testified regarding the sound that the UltraLyte makes when it is tracking a vehicle and the error sign the device displays when more than one vehicle is detected.

The State and defense rested their cases, without the court having ruled on the motion to strike.

---

**5.** Officer Ondayog also testified that he had not performed the "time over distance checks" as he was not instructed on those procedures during his training. With regard to the "instrument confidence check" on the UltraLyte, Officer On-

dayog could not recall if the manual contained any information as to that procedure.

**6.** The device had previously been assigned to another officer.

The State argued in closing argument that Officer Ondayog's testimony satisfied evidentiary requirements under *State v. Assaye*, 121 Hawai'i 204, 216 P.3d 1227 (2009). The State maintained that Officer Ondayog tested and operated the UltraLyte according to the manufacturer's recommended procedures

The State maintained that Officer Ondayog was not required to understand the "internal mechanisms and software" of the UltraLyte. Additionally, the State argued that the pillars Officer Ondayog utilized to perform the delta/distance test were "reasonably close" to the manufacturer's recommended distance of 175 feet.

Thus, the State contended that it had proven by a preponderance of the evidence that Amiral's vehicle was traveling sixty-five miles per hour in an area where the speed limit was fifty miles per hour.

The defense argued in response that Officer Ondayog did not have personal knowledge that the four tests were recommended by the manufacturer and that the training Officer Ondayog received was inadequate, as there was no written or practical examination.

The defense also contended that the State did not produce evidence that the UltraLyte was working properly based on the following: (1) the evidence of the results from the "self-test" and the "display test" were irrelevant as they did not verify that the UltraLyte was accurate; (2) Officer Ondayog's UltraLyte had never been serviced by the manufacturer for software upgrades or maintenance since it was issued to him;[7] (3) the scope alignment test was arbitrary because it was based on Officer Ondayog's subjective hearing and was conducted using a random light pole that Officer Ondayog could not recall the distance for; and (4) Officer Ondayog failed to perform the delta/distance test according to the manufacturer's recommended distance. Thus, the defense contended that the State did not satisfy the evidentiary requirements

under *State v. Manewa*, 115 Hawai'i 343, 167 P.3d 336 (2007) and *Assaye*, 121 Hawai'i 204, 216 P.3d 1227.

The district court found that although Officer Ondayog used a 155-foot marker to conduct the delta/distance test, it was not a "fatal flaw," as the distance recommended by the manual was not a requirement and the UltraLyte would have to be accurate at any distance. The district court also found that Officer Ondayog was qualified to operate his UltraLyte, and the State therefore established a sufficient foundation as to the speed reading. Accordingly, the district court denied the defense's motion to strike Officer Ondayog's testimony and held that the State met its burden of proof by a preponderance of the evidence that Amiral's vehicle was traveling sixty-five miles per hour in an area where the speed limit was fifty miles per hour.

The district court imposed a $75 assessment, a $40 administrative fee, a $7 application assessment, and a $10 neurotrauma fee.

On April 12, 2011, the district court entered its Notice of Entry of Judgment and/or Order and Plea/Judgment reflecting its disposition at trial.

On May 3, 2011, Amiral filed a Notice of Appeal to the ICA.

### C. Appellate Proceedings

Amiral filed an Opening Brief with the ICA and raised the following point of error on appeal:

> (a) The [district] court erred when it failed to sustain defendant counsel's objection pertaining to lack of foundation and hearsay to the admission of the laser gun evidence.

Amiral argued that the district court erred in failing to sustain defense counsel's foundation and hearsay objections to the admission of the speed reading from Officer Ondayog's UltraLyte. Amiral contended that the State

---

7. Defense counsel also argued that the State "need[s] to produce other things [as to the maintenance of the UltraLyte] because apparently they're made once and they never need upkeep other than a battery. They never need any maintenance." Defense counsel observed that the

UltraLyte software was also suspect because "[it] apparently put some software engineers out of business because whenever they designed this thing in the 90s nobody's ever had to improve on the software. There's no updates. There's no codes. There is nothing."

did not provide sufficient evidence demonstrating that Officer Ondayog's UltraLyte was working properly on the date of the citation. Amiral maintained that the State failed to establish that Officer Ondayog had personal knowledge as to whether the four tests were recommended by the manufacturer or as to how the four tests worked. Amiral also argued that the delta/distance test was not conducted according to the manufacturer's recommendation.

Additionally, Amiral argued that the State failed to prove that Officer Ondayog was properly trained and certified in the use of the UltraLyte as required under *Assaye*. Amiral maintained that there was no evidence as to the "nature and extent" of Officer Ondayog's training or that the training satisfied the manufacturer's requirements. Amiral also asserted that the evidence in the record demonstrated that the training did not include a written or practical examination to verify that Officer Ondayog had acquired the required knowledge to correctly operate his UltraLyte and conduct the four tests.

Finally, Amiral contended that the State failed to establish that Officer Ondayog's UltraLyte was properly calibrated as he did not have personal knowledge of the procedure to calibrate the UltraLyte or knowledge that his UltraLyte was calibrated by the manufacturer. Accordingly, Amiral argued that the speed reading should not have been admitted into evidence under *Manewa*, as Officer Ondayog admitted that he had not submitted his UltraLyte to the manufacturer for maintenance or calibration since he had been assigned the device.

In its Answering Brief, the State argued that the district court did not abuse its discretion in finding that there was sufficient foundation for the admission of the speed reading into evidence. The State maintained that Officer Ondayog's testimony demonstrated that (1) he was provided the UltraLyte manual, and (2) his training in the use of the UltraLyte was based on the manufacturer's recommended procedures in the manual. The State therefore contended that there was sufficient evidence demonstrating that Officer Ondayog's training and experience satisfied the manufacturer's requirements.

The ICA issued its Summary Disposition Order on April 30, 2013, which included a dissenting opinion by the Honorable Chief Judge Craig H. Nakamura. The majority opinion found that Officer Ondayog's testimony that he had conducted the four tests on his UltraLyte in accordance with the manufacturer's recommended procedures established that he was sufficiently trained in the use of the UltraLyte. The majority also found that Officer Ondayog's testimony established that the nature and extent of his training met the requirements indicated by the manufacturer.

The majority distinguished this case from *State v. Gonzalez*, 128 Hawai'i 314, 288 P.3d 788 (2012), where the record was silent as to what type of training was recommended by the manufacturer. 128 Hawai'i at 327, 288 P.3d at 801. The majority found that Officer Ondayog's testimony was similar to the testimony of the chemist in *State v. Manewa*, 115 Hawai'i 343, 167 P.3d 336 (2007), "who testified that he tested the device and determined that 'the parameters are within the manufacturer's specification[s.]'" The majority further noted that the *Assaye* court relied upon the chemist's testimony in *Manewa* in stating that "the 'expert's personal knowledge that was adduced through his testimony at trial was sufficient to establish that the [gas chromatograph mass spectrometers] were in proper working condition.'"

In addition, the majority found that under *Assaye* Officer Ondayog's testimony of the manufacturer's recommended procedures, which according to the majority was based upon his personal knowledge of the contents of the manual reflecting those procedures, was not hearsay. Furthermore, as to calibration, the majority found that the evidence showing that the device had been tested in accordance with the manufacturer's procedures was sufficient, and under the majority opinion in *Assaye* no further showing of inspection or servicing by the manufacturer was necessary.

Consequently, the majority rejected Amiral's contention that the district court abused its discretion in admitting the speed reading.

The dissent cited to *State v. Eid,* 126 Hawai'i 430, 443–33, 272 P.3d 1197, 1210–11 (2012), which held that in order to lay an adequate foundation that the speed reading was sufficiently reliable to warrant admission, the prosecution was required to show that (1) the UltraLyte was in proper working order (the proper functioning prong), and (2) the officer who used the UltraLyte was qualified to operate it (qualified operator prong). The dissent found that Officer Ondayog's testimony that he conducted the four tests set forth in the operating manual to determine whether the UltraLyte was in good working order satisfied the proper functioning prong. However, the dissent stated that the State failed to distinguish between the proper functioning prong and the qualified operator prong.

As to the qualified operator prong, the dissent found that the State only presented Officer Ondayog's "conclusory assertion that he was trained to operate the laser gun according to the manufacturer's recommended procedure." Inasmuch as Amiral had adequately raised an objection based on lack of foundation regarding Officer Ondayog's competency to use his UltraLyte, the dissent reasoned that the State was required under *State v. Gonzalez* to introduce more specific evidence from which the conclusion that Officer Ondayog was qualified to operate the UltraLyte could be drawn.

The dissent observed that, in addition to the manufacturer's training requirements, the State could have provided evidence that (1) Officer Ondayog was tested and demonstrated his ability to operate the UltraLyte to obtain accurate speed readings, or (2) the manual contains specific instructions on how to operate the UltraLyte and Officer Ondayog demonstrated competence in following those instructions.

The dissent concluded that without such evidence the State did not satisfy the qualified operator prong and therefore failed to lay an adequate foundation for the admission of the speed reading. Without evidence of the speed reading, the evidence was insufficient to prove that Amiral committed the traffic infraction of Exceeding the Speed Limit.

Pursuant to the majority opinion, the ICA affirmed the district court Judgment.

D.   Application for Writ of Certiorari

On June 4, 2013, Amiral filed an Application and presented the following question:

(a) Did the [ICA] err when it ruled that the [district] court did not err when it found that sufficient foundation had been laid for the laser gun reading?

Amiral argues that the ICA erroneously upheld the district court's finding that a sufficient foundation had been established for the admission of the speed reading into evidence.

Amiral contends that the State failed to produce evidence of the manufacturer's training requirements to operate the UltraLyte or that Officer Ondayog's training met those requirements as required by *Gonzalez.* Thus, Amiral argues, there was no evidence as to the "nature and extent" of Officer Ondayog's training as required by *Assaye.*

Amiral also argues that the State failed to prove that Officer Ondayog's UltraLyte was calibrated as there was no evidence that he was trained or qualified to calibrate his UltraLyte. Amiral maintains that there was no evidence of the manufacturer's recommendations as to the calibration and maintenance of the UltraLyte. Further, Amiral asserts that there was no evidence demonstrating that the UltraLyte was accurate as required by *Manewa* because the device had not been submitted to the manufacturer for calibration or maintenance services since Officer Ondayog was assigned the device.

Lastly, Amiral argues that the State failed to produce evidence that the UltraLyte was working properly on the date of the citation. Amiral maintains that Officer Ondayog did not have personal knowledge as to whether the four tests were recommended by the manufacturer or how the tests worked. Therefore, Officer Ondayog's testimony was based upon inadmissible hearsay.

The State did not file a Response.

## II.  DISCUSSION

### A.

■ Amiral contends that the ICA erred in affirming the district court's finding that Officer Ondayog was qualified to operate his UltraLyte, as there was no evidence that his training met the manufacturer's requirements.

■ In order to establish a sufficient foundation for the admission of a speed reading from a laser gun, the prosecution is required to produce evidence that the "nature and extent of an officer's training in the operation of the laser gun meets the requirements indicated by the manufacturer." *State v. Assaye*, 121 Hawai'i 204, 215, 216 P.3d 1227, 1238 (2009). "[T]o meet this burden the prosecution must establish both (1) the requirements indicated by the manufacturer, and (2) the training actually received by the operator of the laser gun." *Gonzalez*, 128 Hawai'i at 327, 288 P.3d at 801.

In *Gonzalez*, the State provided evidence regarding the extent of the training that the officer who operated the laser gun had received. *Id.* The evidence demonstrated the officer received four hours of training in 2003, and further training in 2009 and 2010. *Id.* However, the record was silent as to "what type of training is recommended by the manufacturer." *Id.* The court in *Gonzalez*, therefore held that "[w]ithout a showing as to the manufacturer's recommendations, the court could not possibly have determined whether the training received by [the officer] met 'the requirements indicated by the manufacturer.'" *Id.*

Similarly in this case, Officer Ondayog testified that he received training in January 2002 and November 2010.  Both courses consisted of a four-hour lecture class on the mechanics and operation of the UltraLyte and four hours of practice.  Officer Ondayog also testified that his training "was based

upon those instructions" in the manual.  The ICA majority opinion held that "Officer Ondayog's testimony was sufficient to establish that the nature and extent of Officer Ondayog's training in the operation of a laser gun meets the requirements indicated by the manufacturer."  The majority opinion differentiated this case from *Gonzalez*, stating that in *Gonzalez* "the record [was] silent as to what type of training is recommended by the manufacturer."

However, as the ICA dissenting opinion notes, "Officer Ondayog's conclusory assertion that he was trained to operate the laser gun according to the manufacturer's recommended procedure" is insufficient to demonstrate that he was qualified to operate the laser gun.  As further noted by the dissent, *Gonzalez* requires, in addition to proof of the "extent" of the officer's training, evidence of "what type of training is recommended by the manufacturer." *Gonzalez*, 128 Hawai'i at 327, 288 P.3d at 801.  In this case, the evidence did not establish what type of training the manufacturer recommended.

Officer Ondayog's testimony that the training he received was consistent with what he read in the manual regarding the manufacturer's recommended procedures is insufficient under the standard established by *Gonzalez*, for the following reasons.

First, no evidence was presented showing that the manual relied upon by Officer Ondayog to perform the four tests actually set forth the manufacturer's recommended training requirements.[8]

Although Officer Ondayog testified that his training conformed with the manufacturer's requirements because his training conformed with the manual, the contents of the manual as to those requirements were not established by the State.  Thus, it is not possible to determine whether the manufacturer's recommendations were actually described in the manual, so that conformance with the

---

8.  It is unclear what "manual" Officer Ondayog was referring to when he testified that the training he received was consistent with the recommended procedures in the manual.  The district court's January 11, 2011 "Order Regarding Production of the Laser Technology, Incorporated Manuals," provides that defense counsel "shall

be allowed to review" and make a copy of the "Marksman instructor manual (pages 1–13)," "Marksman (trainee) manual (pages 14–44)," "LTI UltraLyte operator (user) manual," and "LTI Marksman operator (user) manual."  It is also unclear what the differences are between the four manuals listed in the order.

manual would be equivalent to conformance with the manufacturer's recommendations.

Second, assuming that the manufacturer's recommendations were contained in the manual relied upon by Officer Ondayog, his conclusory statement that the manual conformed to the training he received did not describe the type of training stated in the manual.

Third, there was no other evidence to demonstrate that an officer learning to perform the four tests described by Officer Ondayog satisfies the manufacturer's training requirements. Consequently, the officer's description of the four tests did not identify the type of training recommended by the manufacturer.[9]

Fourth, there is no indication in the record that the instructors of the training courses Officer Ondayog attended were actually certified by the manufacturer or had been trained by the manufacturer. Additionally, there was no evidence that the training course itself was approved by the manufacturer or was consistent with the manufacturer's requirements. Such evidence together with the Officer's learning to perform the four tests could have established the type of training the manufacturer recommended.[10]

Based on the foregoing, the ICA majority erred in holding that Officer Ondayog's training met the manufacturer's requirements on

the basis of his testimony that his training was consistent with the instructions and recommendations he read in the manual. As recognized by the ICA dissent, *Gonzalez* requires "the introduction of more specific evidence from which the conclusions that the officer was qualified to operate the laser gun could be drawn." Accordingly, the State failed to lay an adequate foundation for the introduction of the laser gun reading, and thus the trial court erred in admitting the speed reading into evidence.

### B.

Amiral argues that the ICA erroneously held that the State established a sufficient foundation to admit the speed reading into evidence because there was no evidence that Officer Ondayog's UltraLyte was properly calibrated. The ICA majority held that under *Assaye*, the State was not required to produce evidence that the UltraLyte had been inspected or serviced by the manufacturer because Officer Ondayog conducted the four tests in accordance with the procedures recommended by the manufacturer. While we do not agree that *Assaye* is authority for the principle for which it was cited, in light of our disposition of this case we do not resolve this issue.[11]

9. Cross-examination demonstrated that Officer Ondayog was unfamiliar with various aspects of the UltraLyte.

10. The ICA's dissent states that "there is more than one way to establish the officer's competency," suggested that the State may prove that an officer is qualified to operate a laser gun by producing evidence showing that the officer was tested and demonstrated the ability to operate the laser gun to obtain accurate results. There is no indication in the record that Officer Ondayog had completed any type of proficiency test administered or approved by the manufacturer regarding the proper use of the UltraLyte.

11. In *State v. Wallace*, this court held that the accuracy of an electric balance used to weigh cocaine was not established, where the operator, a forensic chemist, "lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so." 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996). In *State v. Manewa*, the court applied the *Wallace* analysis and held that the reliability of an "analytical balance," a scientific device that measures

weight, required proof that it was properly calibrated by a representative of the manufacturer. 115 Hawai'i 343, 354, 167 P.3d 336, 347 (2007).

In the context of laser guns, the *Assaye* court held that the prosecution failed to establish a foundation for the admission of a speed reading because there was no evidence showing that the four tests the officer conducted on his laser gun "were recommended procedures by the manufacturer for the purpose of showing that the laser gun was in fact operating properly[.]" 121 Hawai'i 204, 217, 216 P.3d 1227, 1240 (2009). However, the majority opinion in *Assaye* did not reach the issue of calibration as discussed in *Manewa*, and therefore did not hold that evidence of calibration was not required. Thus, the conclusion of the ICA's majority opinion, that "[t]he *Assaye* majority did not require any further showing of inspection and service by the manufacturer," is not dispositive.

In addition, the concurrence in *Assaye* indicated that *Manewa* not only requires that the State show that there is an accepted manufacturer's procedure for ensuring that the instrument is in proper working order, but also that the instru-

## C.

Amiral contends that the district court abused its discretion by admitting Officer Ondayog's testimony that his UltraLyte was working properly because Officer Ondayog (1) relied on the instruction he received during his training and his reading of the manual, and (2) lacked personal knowledge that the four tests were recommended by the manufacturer or how the tests worked. Our disposition of this case as previously discussed renders it unnecessary to address this issue.

## III. CONCLUSION

For the foregoing reasons, we vacate the ICA Judgment and the district court Judgment, and remand the case to the district court for further proceedings.

Concurring opinion by RECKTENWALD, C.J., in which NAKAYAMA, J. joins.

I concur in the majority opinion, but write separately to address an additional issue that may arise on remand or in future cases. In discussing the foundation that must be established with regard to "what type of training is recommended by the manufacturer," majority opinion at 178, 319 P.3d at 1186 (quoting *State v. Gonzalez*, 128 Hawai'i 314, 327, 288 P.3d 788, 801 (2012)), the opinion identifies several matters that were not addressed by the police officer's testimony. These include "evidence to demonstrate that an officer learning to perform the four tests ... satisfies the manufacturer's training requirements," and "evidence that the training course itself was approved by the manufacturer or was consistent with the manufacturer's requirements." Majority opinion at 179, 319 P.3d at 1187.

That discussion is premised on the assumption that such requirements do in fact exist. To the extent the manufacturer has established requirements with regard to those matters, those requirements should be put into evidence by the State and considered by the court in determining whether a sufficient foundation has been established. *See, e.g., State v. Assaye*, 121 Hawai'i 204, 215, 216 P.3d 1227, 1238 (2009) (the State must prove "whether the nature and extent of an officer's training in the operation of a laser gun meets the requirements indicated by the manufacturer").

However, in the absence of such requirements, the State can attempt to establish the necessary foundation through other means. The ultimate question is whether "the operator was qualified by training and experience to operate the unit." *Id.* at 214, 216 P.3d at 1237 (emphasis omitted) (quoting *State v. Tailo*, 70 Haw. 580, 582, 779 P.2d 11, 13 (1989)).

For example, in *State v. Eid*, 126 Hawai'i 430, 272 P.3d 1197 (2012), this court considered whether the State had established a sufficient foundation to admit the results of testing performed on a police car to confirm the accuracy of its speedometer. Those tests had been performed by two licensed automotive mechanics using a device called a speedometer dynamometer, which consisted of two rollers, a cable and a device called a master head. *Id.* at 434, 272 P.3d at 1201. The vehicle being tested would be placed on the dynamometer so that the rollers would turn when the engine was started, which would cause the cable to rotate, which in turn would cause a speed reading to be generated by the master head. *Id.*

Although the identity of the manufacturer of the master head was known, the mechanics were not aware of who had manufactured the other components that comprised the device, which they had purchased from another mechanic. *Id.* at 435 n. 10, 272 P.3d at 1202 n. 10. In short, the record did not even establish the identity of the manufacturer, let alone any requirements with regard to the training of potential operators. *Id.* at 445, 272 P.3d at 1212. Nevertheless, this court

---

ment has been inspected and serviced as required by the manufacturer. 121 Hawai'i at 217, 216 P.3d at 1240 (Acoba, J., concurring).

Officer Ondayog initially testified that the delta/distance test verified the "accuracy of the instrument, the calibration." He later testified, "I don't calibrate. I just conduct those four tests, that's it." As Officer Ondayog explained, "I'm not an [LTI] employee." Consequently, the record is unclear as to whether calibration or maintenance of the UltraLyte is periodically necessary to assure its accuracy.

held that a proper foundation had been established:

> [T]he State established that the persons conducting the speed check were qualified by experience to operate the device. The State established at the pretrial hearing that only Roy and Duane, experienced auto mechanics, performed speed checks on HPD vehicles in 2007. The district court qualified Roy as an automotive vehicle expert and a motor vehicle mechanic dealer expert and qualified Duane as an expert in the fields of automotive mechanics and repair and automotive technology. Although Roy did not receive specific training on how to use the speedometer dynamometer, Roy testified that "for a mechanic, it's pretty straightforward." Notably, Eid's expert witness, Ho, similarly testified that he was not aware of any certification, school, or formal training for operating or using a speedometer dynamometer. Rather, Ho testified that a person would gain knowledge about a speedometer dynamometer by using it and through experience.
>
> By showing that the speedometer dynamometer was in proper working order and used by qualified mechanics in conducting the speed checks, the State provided adequate assurances that the results of the speed checks were reliable. . . .
>
> . . . . While the manufacturer of the rollers and cable was not established, the absence of that information was not material, since their operation was straightforward and within the expertise of Roy and Duane as licensed mechanics.

*Id.* at 444–45, 272 P.3d at 1211–12 (citations, footnotes, brackets, and internal quotation marks omitted).

Thus, in the absence of manufacturer's recommendations as to training, the State can utilize other means to establish that the operator had the necessary training and expertise. The record in *Eid* revealed that the dynamometer was a simple device that was well within the understanding of an experienced mechanic, and thus a sufficient foundation was established. In the instant case, although the officer testified that he had been trained to test the device according to the instructions in the operating manual, the nature of the tests and the officer's ability to perform them competently were not sufficiently established by his testimony. For example, the officer described a "delta distance velocity test or the calibration test," which involved pointing the laser at two concrete pillars located 155 feet and 130 feet from the officer. His explanation of the significance of the test during his direct examination was as follows:

Q. What are you testing for in this test?

A. To verify the accuracy of the instrument, the calibration.

Q: Can you—well, sir, if the laser were to fail that test, how would you know?

Q: It would not—you need to—distance times the speed should be—my laser should display 50 which will get you 50.

Q: Do you know—well, so if the laser wasn't working properly, what would it display?

A: We are not sure, within plus or minus 1. Say, for example, it's at 47 feet— 155 subtract the 130 comes out to 25. We times it by 2 because distance is times by—the distance times by speed. So it should come up to 50. But if it comes out to like 46, 47, then the calibration of the instrument—the verification of the calibration of the test is not accurate.

While it is not necessary for the officer to explain the internal circuitry of the device, the officer's competency to operate the device may be corroborated if he or she can explain the tests that are being performed in a way that allows the court to understand those tests and thereby assess the training necessary to perform them. The record here was not sufficient to permit such an assessment, and the officer's conclusory statements about his training were not sufficient to establish the necessary foundation.